UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

YIPPY, INC. and RICHARD GRANVILLE,

                Plaintiffs,

      - against -

HANOVER HOLDINGS I LLC and MAGNA
GROUP LLC,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

    Civil Action No. 17-7773

    **COMPLAINT**

Plaintiffs Yippy, Inc. and Richard Granville, by and through their attorneys, John H. Snyder PLLC, in support of their Complaint against Hanover Holdings I, LLC and Magna Group LLC, state as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.

## Parties

1.    Yippy, Inc. ("Yippy") is a technology company committed to helping customers securely access data anywhere on earth. Over the past several years, Yippy has entered into a series of strategic partnerships and transactions designed to enhance Yippy's product and service offerings. The Company's foundation is built on its unlimited, perpetual, worldwide, non-exclusive license of the Velocity search platform and associated technologies which Yippy acquired in 2010 from Vivisimo, Inc. In 2012, IBM purchased Vivisimo and rebranded Velocity as IBM Watson Explorer®. Yippy maintains its worldwide perpetual license of the technology. Based upon Watson, which Yippy operates autonomously from IBM,

and coupled with other internally developed and acquired technologies, the Company has developed a suite of technology solutions which enhance the underlying technology's output while simplifying the deployment process. These solutions range from cloud, enterprise search, business intelligence, document security and data compression for MSS/FSS satellite and terrestrial wireless operators. Additionally, the Company has developed middleware, connectors and associated programs which enable deployments to be successful with substantially less resources and personnel as typically required in the industry. Yippy is a Nevada corporation with its principal place of business at 1845 San Marco Road, Suite 201, Marco Island, Florida 34145.

2.     Richard Granville is the Founder and CEO of Yippy, with his principal place of business at 1845 San Marco Road, Suite 201, Marco Island, Florida 34145.

3.     Hanover Holdings I, LLC ("Hanover") is a New York Limited Liability Company, with its principal place of business located at 40 Wall Street, New York, New York 10005.

4.     Magna Group LLC is a Texas Limited Liability Company, with its principal place of business located at 40 Wall Street, New York, New York 10005.

5.     Magna, Hanover, and their affiliates do business under the brand name "Magna." To avoid ambiguity, when referring to Magna's business generally, we refer to "Magna." When referring to Defendant Magna Group LLC in particular, we use its full name.

## Jurisdiction and Venue

6.     This Court has original jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Securities Exchange Act and the Constitution of the United States. This lawsuit is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.     Venue in this district is appropriate because Defendants Magna Group LLC and Hanover are domiciled in the Southern District of New York and have their offices in the Southern District.

## Factual Background

8.     Magna provides "toxic finance" to small cap companies, profiting from their failure.[1]  In 2012, before Magna's reputation became well-known, Yippy entered into a loan agreement, which led to litigation, which in turn led to the Settlement Agreement that forms the basis for this action.  The Settlement Agreement dated is attached as **Exhibit 1**.

9.     The Settlement Agreement obligated Yippy to make a series of payments, which Yippy has fully performed.

---

[1]     We have attached as **Exhibit 2** a March 12, 2015 Bloomberg article by Matt Levine, which gives an excellent description of Magna's business and its use of the Section 3(a)(10) exemption from the Securities Act of 1933's registration requirements.

Attached as **Exhibit 3** is a more formal treatment of Section 3(a)(10) and its abuses, see Thomas S. Glassman, 3(A)(10) Financing: New Predatory Financing Using the Securities Act, 5 Mich. Bus. & Entrepreneurial L. Rev. 99 (2016).

10.    Long before the Settlement Agreement was executed in early 2017, Magna Group LLC acquired Yippy stock certificate 640, a certificate bearing the name Magna Group LLC representing 200,000 restricted shares of common stock (the "Magna Certificate").   A copy of the Magna Certificate, as produced in discovery in 2015, is attached as **Exhibit 4**.  A copy of the Magna Certificate, sent on October 10, 2017 at 5:02pm, by Scott Furst, counsel for Magna, is attached as **Exhibit 5**.

11.    The Settlement Agreement gave Yippy an option to purchase the Magna Certificate for $200,000.   On September 13, 2017, Yippy gave notice exercising the option.  On October 5, 2017, Yippy wired the full purchase price to its attorney's escrow account, with instructions to compete the purchase. Yippy validly tendered $200,000 and demanded delivery of the Magna Certificate.

12.    Magna Group LLC and Hanover failed to deliver the Magna Certificate by October 7, 2017 as prescribed by the Settlement Agreement.

13.    On October 10, 2017, a telephone conversation took place, during which Scott Furst (counsel for Magna / Hanover), Mark Cortangelo (counsel for Yippy) and Richard Granville (CEO of Yippy) were present.  Mr. Cortangelo is a fact witness and will not participate as counsel in this case, pursuant to the attorney-witness rule.

14.    The purpose of the telephone call was to discuss why Magna / Hanover were unable to produce the Magna Certificate.   During the course of the

conversation, Mr. Furst stated unequivocally that he was in physical possession of a stock certificate for 200,000 shares in the name of **Hanover Holdings I**.

15.     Mr. Granville was surprised by Mr. Furst's statement because Mr. Granville knew that the Magna Certificate was the only stock certificate owned by any Magna entity.  Mr. Granville responded to Mr. Furst, "are you sure it Hanover Holdings, because I thought it was Magna Group."  At that point, Mr. Furst stated that he had the certificate in his possession, and reaffirmed clearly and definitively that the certificate in his possession bore the name Hanover Holdings I.  Mr. Granville asked Mr. Furst to "take a picture" of the certificate.  Mr. Furst stated that he would send a copy.  Mr. Granville responded, in sum and substance, "no, I don't want a copy of a copy, I want a picture of the actual certificate in your possession."

16.     Immediately after the telephone call, Mr. Granville consulted his stock list to confirm that no certificate bearing the name Hanover was validly issued. Thereafter, Mr. Granville contacted Yippy's transfer agent, Pacific Stock Transfer, which confirmed that the Magna Certificate remains registered under the name Magna Group LLC.

17.     Thereupon, Mr. Granville sent the following email to Mr. Furst, which was sent on October 10 at 1:13pm:

> Scott,
>
> You just told Mark and myself at appropriately 11:20am this morning, to "save you the trouble from looking up the name of the certificate on the SPR, that the name on the certificate, was "HANOVER HOLDINGS I".  You said, "I have the certificate right here in my possession."  Then you and I began

a very lengthy conversation regarding Hanover Holdings I and if they were a "valid corporation", and you affirmed "yes". I asked you if Hanover Holdings I had a bank about at Chase bank. You affirmed "yes". You read an email and contents of which are that Hanover Holding had to complete additional steps to get a Medallion stamp guarantee." You refused to share that email as proof of Chase's position. You said, "you need to get the certificate to your clients". As well as some other things I have put down on paper for history of conversation.

Here's your problem. The certificate is in the name of:

MAGNA GROUP LLC 5 HANOVER SQUARE STE 2102 NEW YORK, NY 10004

CS2-    640 200,000 Restricted 200,00009/27/12 200,000Total Restricted Shares.

I repeat the same questions as before. Is Magna Group LLC a valid corporation? Does Magna Group LLC have a valid bank account at Chase bank? If so why would they need to do any additional steps other than just walk in the door and get the VERY VERY simple transaction completed? I recieve a Medallion from Chase in "minutes".

Please help me understand, because your argument that the contract does not state you have to provide a Stock Power "bill of sale" and a signed executed certificate both with Medallion stamps is weak. Maybe we could just surrender a check to you for $200K and not sign it.

Please take a picture of the certificate in your hand and send to us. Right now it does not appear to anyone that you actually have the certificate. You told Mark "I sent you a copy", but Mark said, "You did not send me a copy at anytime".

How do you have a certificate in your hand for Hanover Holdings I, which you repeated over and over again, when I says MAGNA GROUP, LLC.

Thank you in advance for the clarifications.

take care...
rich

6

18.     In the above-quoted email, Mr. Granville for a second time asks Mr. Furst to "please take a picture of the certificate in your hand and send to us."  Mr. Granville could not be more explicit.  He wanted proof that Mr. Furst had actual possession of a Yippy stock certificate, and if so, whose name was it under.  As the CEO of a public company, Mr. Granville has an obligation to investigate potential problems with his stock, including Mr. Furst's admission that he was in possession of a forged stock certificate.

19.     Receiving no response, Mr. Granville again emailed Mr. Furst at 1:57pm, this time copying Yippy's transfer agents:

> Scott,
>
> I have just hung up with the transfer agent and we discussed the only possibility that you are in possession of a counterfeit stock certificate in the name of Hanover Holdings I.   No reasonable person would think you would jeopardize your career and law license to tell us the name on a certificate and it not be correct. Especially you saying it was "right in front of you". Therefore we believe you client is lying to you, and they have created documents and counterfeited the certificate most likely in house or through their close friends who are also transfer agents (V-Stock Transfer is an example).  Would you consider this a fraudulent act?
>
> Please send us a copy of the Hanover Holdings I certificate as soon as possible.  As the issuer of the security and with the knowledge of this counterfeit shares exist, I need the copy and get with the proper authorities today.
>
> When do you expect to send us a picture of the certificate?  We need this asap.
>
> take care...
>
> rich

20.     As indicated above, once again, Mr. Granville asked, "When do you expect to send us a picture of the certificate?"

21.     An hour passed.  Then another.  Then another.  Mr. Furst remained radio silent until 5:02pm, when he casually responded:

> As an aside, a photocopy of the front of the certificate is attached.  I believe I had mistakenly referred to the certificate as issued in the name of Hanover.  While it's of no particular importance, I've attached the photocopy to address Mr. Granville's speculation that my client does not possess any certificate for the restricted shares.

22.     Mr. Furst's response raises red flags.  First, he offers absolutely no explanation for how he could have been "mistaken" as to whether a certificate that he claimed to be *actually looking at* said "Hanover Holdings I" or "Magna Group LLC," nor the several-hour delay in clarifying that point (despite urgent emails from Yippy).

23.     Second, Mr. Furst once again failed to provide a picture of the certificate.  He sent a photocopy of the Magna Certificate (see Exhibit 3), which proves nothing.

24.     Yippy's outside counsel, Mark Cortangelo, sent a lengthy email to Mr. Furst at 8:30pm on October 11, 2017 stating in relevant part:

> On Friday, October 6, 2017, you told me that the principals were out of the country and that you didn't know where they were or when they would be back or if they could get the medallion guaranty and that your offices were uptown, not downtown near the client like they used to be, so you could not just hand the share off to them and get it stamped.  But today you said that your client had the share and was trying to get it stamped.  The whole sequence of events is muddled, at best.  But what makes it more confounding is that today you

unequivocally told us on the phone that the share certificate was in the name Hanover Holdings I, but when you sent the copy, it is to Magna.  My client has serious reservations about the authenticity of the shares and further to that point demands that you furnish the stock power inadequacy note from bank along with the requested email you read to us regarding the additional steps needed.  Clearly, his concerns about making sure that the documents are in order is not unfounded.

25.    Mr. Furst's inconsistent statements and evasive behavior (including his continued refusal to show his purported certificate) compel Yippy to investigate and bring the matter to appropriate authorities, so that legitimate investors can be protected.

26.    It should be noted that when Yippy exercised its option on September 13, 2017 to purchase the Magna Certificate for $200,000, Yippy's publicly traded stock price was approximately 65 cents per share, with downward pressure on the price that cannot be explained by business fundamentals.  Magna did not expect Yippy to exercise its call option.  Instead, Magna presumably expected that Yippy would be unable or unwilling to pay $1 per share for its own stock, and that Magna would be able to obtain (at deeply discounted prices) a very large block of free-trading Yippy shares through the Rule 3(a)(10) procedure set forth in the Settlement Agreement.  Magna is in possession of the evidence necessary to explain this "confounding" series of events.  However, it bears noting that if Yippy had not exercised its call option, Magna could have made a large profit by naked shorting ahead of the Rule 3(a)(10) procedure, then using the Rule 3(a)(10) shares to cover – either themselves or through intermediaries.

### The Settlement Agreement

27.     When Hanover negotiated the Settlement Agreement with Yippy in January 2017, Mr. Furst insisted that several provisions be included, the net effect of which is to create extreme uncertainty as to Yippy's conflicting legal obligations with respect to apparent securities law violations.

28.     Paragraph 8 of said Settlement Agreement states:

> Representation and Covenant Not to Sue. The Parties hereby represent and agree that, with the exception of the papers filed in the Yippy Action and the Granville Action, they have not filed or pursued, and will not file or pursue, any charges, suits, complaints, grievances, or other actions which assert, arise out of or are in any way related to the claims released under this Agreement; provided, however, that this paragraph shall not apply to any action or claim to enforce the terms of this Agreement or from responding to any inquiry about this settlement or its underlying facts by the Securities and Exchange Commission, FINRA, federal or state agency, any other self-regulatory organization.

29.     Paragraph 9 of said Settlement Agreement states:

> Representation and Covenant Not to Solicit Litigation. Yippy and Granville agree and covenant that, within five (5) business days of executing this Agreement, Yippy and Granville will provide Plaintiff with a document evidencing their respective written directions to Defendants' former attorney, John H. Snyder PLLC, to remove from online posts, marketing materials, blogs, websites, website forums, bulletin boards, chatrooms, or message boards, content that does or intends to solicit clients or potential clients who have: (a) engaged in business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies; or (b) invested in or engaged in other business with any company that also has done business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies, and Yippy and Granville shall obtain Mr. Snyder's written confirmation of his compliance with such directions

10

within ten (10) business days of executing this Agreement and provide same to Plaintiffs Counsel.

30.     Paragraph 10 of the Settlement Agreement provides:

Non-disparagement. Each Party agrees and covenants that Each Party will not, at any time, disparage or make negative or false statements about any other Party or any subsidiary or affiliated entity of any Party and any officer, shareholder, director, employee, agent, or attorney of any Party in their individual or representative capacities. Each Party shall report, in accordance with the notice provisions set forth under the Agreement, to each other Party any actions or statements that are attributed to a Party that the reporting Party believes are disparaging or false. The reporting Party may take actions consistent with the provision for breach of this Agreement, except as they relate to Paragraphs 1 or 3, should it determine that a Party has disparaged or made false statements about the reporting Party. The foregoing shall not prohibit or limit a Party's ability to respond truthfully to any inquiries from or satisfy any disclosure requirements to any governmental or regulatory authorities.

31.     During the negotiation of the Settlement Agreement, on January 9,

2017, Mr. Furst explained the purpose of these provisions:

Yippy and Granville shall jointly execute an affidavit, approved by Hanover's Counsel, that shall be provided to the United States Securities and Exchange Commission ("SEC") retracting any all allegations made by Yippy, Inc. and Granville relating to Hanover, Magna, affiliated companies, and any of their officers and employees, relating to their business, trading practices, or enforcement of their contractual rights as to any individual or entity with which they do business, and further aver that they have identified no evidence to substantiate the allegations made by them or on their behalf in connection with this Yippy action or the Granville defamation action, to any investors in the marketplace under their own names or using anonymous aliases, or to the SEC concerning any of the subjects raised by Yippy or Granville in connection with any pleadings, discovery, or motions arising from this Yippy action or the Granville defamation action. **[Mr. Granville has asked me to me to direct 2 sets of inquiries to certain employees relating to**

11

**transfer agent change and a press release issuance for Tag Like Me and to report back to him. That report/response may then confirm a good faith basis for Mr. Granville to execute an affidavit that neither Yippy nor Mr. Granville have identified any evidence to substantiate the allegations made by them or on their behalf concerning shorting, "naked" shorting or violations of the securities laws. Additional subject matter of the affidavit t/b/d. Mr. Granville understands that any settlement agreement would not preclude him from complying with a subpoena issued by any governmental body.]**

32.     Separately and together, these provisions create legitimate question as to Yippy's obligations.  The terms of the Settlement Agreement are reasonably interpreted to prohibit Yippy from bringing evidence of securities law violations committed by Magna to the SEC.  Paragraph 8 forbids Yippy from filing "any . . . complaints, grievances, or other actions which assert, arise out of or are in any way related to the claims released under this Agreement" (as is the case here). Paragraph 9 prohibits solicitation of litigation, which could encompass discussions with the SEC's Enforcement Division or the United States Attorney's Office. Paragraph 10 prohibits Yippy from making "negative or false statements" about Magna, with the disjunctive indicating that Yippy is barred from making truthful statements that may be unflattering to Magna.

# FIRST CAUSE OF ACTION
## Declaratory Judgment Pursuant to 15 U.S.C. § 78cc

33.   The foregoing allegations are incorporated by reference.

34.   Yippy is a publicly traded company, and Mr. Granville is the Chairman and CEO of Yippy.

35.   Mr. Granville has concluded that his fiduciary responsibilities require him to act proactively to protect his legitimate investors.

36.   Pursuant to 15 U.S.C. § 78cc:

(a) Waiver provisions

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.

(b) Contract provisions in violation of chapter

Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and **every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation**: Provided, (A) That no contract shall be void by reason of this subsection because of any violation of any rule or regulation prescribed pursuant to paragraph (3) of subsection (c) of section 78o of this title, and (B) that no contract shall be deemed to be void by reason of this subsection in any action

maintained in reliance upon this subsection, by any person to or for whom any broker or dealer sells, or from or for whom any broker or dealer purchases, a security in violation of any rule or regulation prescribed pursuant to paragraph (1) or (2) of subsection (c) of section 78o of this title, unless such action is brought within one year after the discovery that such sale or purchase involves such violation and within three years after such violation. The Commission may, in a rule or regulation prescribed pursuant to such paragraph (2) of such section 78o(c) of this title, designate such rule or regulation, or portion thereof, as a rule or regulation, or portion thereof, a contract in violation of which shall not be void by reason of this subsection.

37.    In the absence of any plausible explanation from Mr. Furst or Magna regarding why the Magna Certificate has not been produced (and why Mr. Furst told us that he had possession of a certificate in the name of Hanover Holdings I), Yippy and Mr. Granville have a well-supported concern that its stock may have been manipulated by Magna.

38.    Insofar as the Settlement Agreement is construed to limit the right of Yippy and Mr. Granville to discuss these matters with shareholders and appropriate authorities, it is unenforceable.

## SECOND CAUSE OF ACTION
### Declaratory Judgment Pursuant to the First Amendment to the United States Constitution

39.    The foregoing allegations are incorporated by reference.

40.    Under the First Amendment to the United States, judicial enforcement of the Settlement Agreements in a fashion that limits Yippy's right to comply with other governmentally imposed duties constitutes state action.

41.    Without declaratory relief, Yippy and Mr. Granville are forced to choose between violating state-imposed fiduciary duties to shareholders and the

Company (on the one hand) and potentially violating the restrictive covenants that Magna and Mr. Furst insisted upon in January 2017.

42.   The Settlement Agreement violates the First Amendment right to free speech.

### THIRD CAUSE OF ACTION
**Declaratory Judgment – Public Policy**

43.   The foregoing allegations are incorporated by reference.

44.   As a matter of public policy, Courts will not enforce agreements that purport to bar a party from reporting unlawful conduct.

### FOURTH CAUSE OF ACTION
**Specific Performance**

45.   The foregoing allegations are incorporated by reference.

46.   Yippy has made all payments due under the Settlement Agreement.

47.   Yippy stood ready, willing and able to purchase the Magna Certificate for $200,000.  Magna has failed to tender the Magna Certificate, and has failed to provide proof that Magna remains in possession of the Magna Certificate.

48.   Yippy's obligations under the Settlement Agreement have been fulfilled.  Magna should be ordered to take all steps necessary to remove the five (5) UCC-1 filings, which to date, Magna has not removed.

## **Prayer for Relief**

WHEREFORE, Plaintiffs request that the Court enter judgment:

A)      Declaring the Settlement Agreement void, to the extent it purports to limit Yippy's ability to report securities violations to investors and/or regulators.

B)      Declaring that Plaintiffs may report truthfully to the SEC and investors regarding evidence of securities law violations affecting Yippy stock.

C)      Ordering Magna to remove all UCC-1 filings made pursuant to the Settlement Agreement.


Dated:        New York, New York
              October 11, 2017


                              _____
                              JOHN H. SNYDER

                              John H. Snyder
                              555 Fifth Avenue, Suite 1700
                              New York, New York 10017
                              Tel:  (212) 856-7280
                              Fax:  (646) 304-9230
                              *john@jhsnyderlaw.com*

                              *Counsel to Richard Granville and Yippy, Inc.*

EXHIBIT

1

## AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between Hanover Holdings I, LLC ("Plaintiff" or "Hanover"), on the one hand, and Yippy, Inc. ("Yippy"), Richard Granville ("Granville"), and Mahoma Investing Ltd. ("Mahoma") (collectively, the "Defendants") (Plaintiff and Defendants collectively, the "Parties"), on the other hand, and is effective as of January 13, 2017 (the "Effective Date").

## RECITALS

WHEREAS, Plaintiff commenced an action entitled <u>Hanover Holdings I, LLC v. Yippy, Inc., Richard Granville, and Mahoma Investing Ltd.</u>, Index No. 652363/2014, in the Supreme Court of the State of New York, New York County, asserting causes of action against Defendants (the "Yippy Action") in connection with Plaintiff loaning funds to Yippy in exchange for, among other forms of consideration, a $475,000.00 promissory note entered into in or around June 2012, a $55,000.00 promissory note entered into in or around September 2012, and a $85,000.00 promissory note entered into in or around November 2012, together with  a guaranty, a personal guaranty, and a pledge and security agreement given by one or more Defendants securing the repayment obligations of Yippy to Plaintiff, for which an alleged, aggregate, unpaid principal balance exceeding Six Hundred and Eighty-Six Thousand and Fifty-One Dollars and No Cents ($686,051.00) plus accruing contractual and statutory interest and attorneys' fees remains;

WHEREAS, Defendants filed an Answer, which denied all claims and asserted numerous affirmative defenses;

WHEREAS, on January 13, 2017, the parties entered into, and agreed to be bound by, certain principles of settlement effective January 13, 2017, a copy of which is annexed hereto as

1

Exhibit A, and incorporated by reference herein, and to memorialize further and complete terms of settlement herein;

WHEREAS, the parties agree that the foregoing recitals are incorporated into this Agreement and are considered to be fully a part of the Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the sufficiency and receipt of which is acknowledged, it is hereby stipulated and agreed, by and among the undersigned, that all claims and disputes between the parties hereto arising from the foregoing, or which could have been asserted therein, are fully and finally settled upon the following terms and conditions (the "Settlement"):

1.   <u>Settlement Payment</u>.   Defendants  jointly and severally agree to pay, and Plaintiff agrees to accept, the amended total sum of $650,000.00 (the "Settlement Principal"), *plus* $10,000.00 representing an additional sum Defendants agree to pay at the time of execution of this Agreement, which represents additional attorneys' fees and costs that will be escrowed by Plaintiff's attorneys and applied by Plaintiffs' attorneys to cover all fees and costs that may be incurred in connection with the filing of the Confessions of Judgment discussed further below in the event that Defendants fail to pay all financial terms of this Agreement as set forth more fully below (the "Confession of Judgment Fees and Costs") (collectively, these amounts comprising the "Settlement Amount").  The payments made pursuant to Paragraph 1 shall be made by certified check or wire payable to "Sichenzia Ross Ference Kesner LLP As Attorneys for Plaintiff Hanover Holdings I, LLC."  The Settlement Principal shall be paid according to the following payment schedule and terms and conditions:

(a)      Defendants shall pay Plaintiff the sum of One Hundred and Fifty

Thousand Dollars and No Cents ($150,000.00), of which an initial payment deposit of $50,000.00 (the "Initial Deposit") was wired to Plaintiff's attorney and will be disbursed to Plaintiff upon execution of this Agreement, with the balance of One Hundred Thousand Dollars and No Cents ($100,000.00) due on or before February 17, 2017 (together with the Initial Deposit, the "Initial Payment"). Time is of the essence with respect to payments due under this Paragraph 1(a).

(b)    Defendants shall pay to Plaintiff the sum of Three Hundred Thousand Dollars and No Cents ($300,000.00) in four (4) equal, monthly installment payments of Seventy-Five Thousand Dollars and no Cents ($75,000.00) on the following dates: March 20, 2017, April 20, 2017, May 20, 2017 and June 20, 2017 (collectively, the "Installment Payments"). If, for any reason, Defendants fail to remit any Installment Payment by the date specified in this Paragraph 1(b), the parties agree that such default, as to which no written notice of such default shall be required of Plaintiff, shall be "cured" if full payment of the Installment Payment is received by Plaintiff within ten (10) business days of the date the Installment Payment was due (a "Cure Period"). Subject to a Cure Period, time is of the essence with respect to payments due under this Paragraph 1(b). No payment of any Installment Payment during a Cure Period will delay or extend any other date by which Defendants shall remit any other payment due under this Paragraph 1.

(c)    Restricted Share Liquidation. Defendants acknowledge and agree that Plaintiff or its designee is the record owner of 200,000 restricted shares of Yippy common stock (the "Plaintiff's Shares") that are validly-issued, fully-vested, and owned by Plaintiff or its designee with all attendant rights and privileges of a

3

shareholder of Yippy.  Yippy further acknowledges and agrees that it shall exercise all efforts to ensure that all conditions set forth under Rule 144 of the Securities Act of 1933 are satisfied such that the Plaintiff's Shares may be resold in the marketplace by Plaintiff or its designee.  Nonetheless, as further consideration to resolve by settlement Plaintiff's bona fide claims against, among others, Yippy, the Parties further agree as follows:

    i.    "<u>Plaintiff Call Option</u>".  At any time on or before September 15, 2017, Yippy or its designee shall have the right, but not the obligation, exercisable on not less than two (2) business days prior written notice (the "<u>Option Notice</u>") to Plaintiff, to purchase all, but no less than all, of Plaintiff's Shares from Plaintiff or its designee on the date of the Option Notice at a price per share equal to $1.00 (the "<u>Option Price</u>"), i.e., $200,000.00 for all of Plaintiff's Shares.  Any Option Notice shall be irrevocable and delivered to Plaintiff, in accordance with the notice provisions set forth under the Agreement, and shall state (1) that Yippy is exercising its right to purchase Plaintiff's Shares and (2) the date fixed for payment (the "<u>Option Date</u>").  Plaintiff, on the Option Date, shall receive such amount in cash upon the surrender of the original stock certificates representing Plaintiff's Shares, and Plaintiff's Shares shall be considered as retired and returned to Yippy's treasury and have no further rights.

    ii.    If the Plaintiff Call Option is not exercised on or before September 15, 2017, within 21 days thereafter, i.e., October 7, 2017, the Chief Executive

Officer of Yippy, Inc., if not Richard Granville, shall affirm, via affidavit provided to Plaintiff by October 9, 2017, that Yippy did not and does not have the financial ability to exercise the Plaintiff Call Option, and the parties shall jointly seek an Order from the Court approving, pursuant to a fairness hearing conducted under Section 3(a)(10) of the Securities Act of 1933, a sufficient number of free-trading shares of Yippy common stock, calculated at the trading volume weighted average price of Yippy common stock over the 45-consecutive trading day period immediately preceding the issuance of the Order, for Plaintiff or its designee to recoup $200,000.00 in sale proceeds (with Yippy to receive a copy of the calculation from Plaintiff, in accordance with the notice provisions set forth under the Agreement, and all trade confirmations concerning such approved sales).  No later than the first trading day following the date that the Court enters its Order approving this settlement, pursuant to Section 3(a)(10) of the Act, Yippy shall deliver to Plaintiff, in accordance with the notice provisions set forth under the Agreement, all free trading shares.  Time is of the essence with respect to this Paragraph 1(c).

2.      <u>Withdrawal and Discontinuance Of Actions</u>:  After receipt and release to Plaintiff of the Settlement Amount, the Parties shall stipulate to discontinue with prejudice the Yippy Action together with a related action, captioned, <u>Joshua Sason *et al.* v. Richard Granville</u>, Index No. 153480/2015 (the "Granville Action").  The stipulations of discontinuance for the Yippy Action and Granville Action may be filed without further notice by any Party to any other Party. The Parties agree to bear their own costs and attorneys' fees incurred in connection with the

Action settled herein, except as provided for herein and in the Judgment Documents regarding

the enforcement of this Agreement or the entry of judgment in the event of a default by Yippy

or Granville.

3.      Default and Non-Exclusive Remedies.  In the event that Defendants' default in

making any of the Initial Payment and Installment Payments, and with respect to Plaintiff's

Shares, default in making payment to Plaintiff of $200,000.00, pursuant to the Plaintiff Call

Option in Paragraph 1(c)(i), or, in the alternative, for whatever reason, Plaintiff does not recoup

$200,000.00 in sale proceeds from the sale of Plaintiff's Shares, pursuant to Paragraph 1(c)(ii),

as required under Paragraph 1, for which no written notice of such default shall be required from

Plaintiff, the full balance of the Settlement Amount, *less* any payments made by or on behalf of

Defendants, *plus* all costs and all attorneys' fees incurred to obtain and enforce a judgment in

the event of a default, and interest on the unpaid balance allowed as a matter of law, as

described more fully in the Judgment Documents (as defined below), shall become immediately

due, payable and collectable, *ex parte* and without further notice to Defendants, except that

Plaintiff shall notify Defendants of the balance of the Settlement Amount to be recorded by

Plaintiff's Counsel in the Judgment Documents.  Plaintiff shall be entitled to enter confessed

judgment against Yippy and Granville jointly and severally, pursuant to Section 3215(i) of the

New York Civil Practice Law and Rules, as follows:

(a)      Confession of Judgment. Defendants agree that Plaintiff shall have the

right to enter confessions of judgment against Yippy and Richard Granville, jointly

and severally, for the full balance of the Settlement Amount, *less* any payments made

and received pursuant to Paragraph 1 (collectively, the "Confessions of Judgment",

copies of which, together with supporting affidavits of Yippy and Granville and

6

Stipulated Judgments, the "Judgment Documents"), *plus* all costs and all attorneys'

fees incurred to obtain and enforce a judgment in the event of a default, and interest

on the unpaid Settlement Principal allowed, as a matter of law.  Yippy and Granville

shall execute concurrently with this Agreement and collectively annex hereto as

Exhibit B the Judgment Documents.  Yippy and Granville further consent and agree

that Plaintiff may file the Judgment Documents *ex parte* and without further notice to

Defendants, with the County Clerk of the Supreme Court, Civil Branch, in New

York County, or in any other court of competent jurisdiction, including, but not

limited to, New York, Georgia, and Florida, without further notice to Yippy or

Granville, to obtain a judgment by confession, in the event of Defendants' default in

making any payment due under Paragraph 1.

(b)     Plaintiff shall not file or record the Judgment Documents unless and until

Defendants default on full payment of the Settlement Amount.  At the time of

execution of this Agreement, Defendants shall also provide Plaintiff with the

Confession of Judgment Fees and Costs, which will be a cash payment of $10,000.00

that will be held in Plaintiff's attorneys' escrow account and disbursed, without

further notice or approval from Defendants, to cover any costs and attorneys' fees

incurred by Plaintiff with filing the Judgment Documents.  If, however, Plaintiff

receives all payments under Paragraph 1 and files the stipulations of discontinuance

with prejudice as set forth in Paragraph 2, then Plaintiff will return the Judgment

Documents and Confession of Judgment Fees and Costs held in Plaintiff's attorneys'

escrow account to Defendants.

(c)     Yippy and Granville hereby acknowledge that they are making  a

7

voluntary, knowing and intelligent waiver of their right to notice or demand, of any kind whatsoever, and any objection, defense, claim, counterclaim, crossclaim, or offset, of any kind whatsoever, they may now or in the future have to any term or condition of the Judgment Documents, including as to the filing of same by Plaintiff, and further acknowledge that they have been represented by counsel of their choice who has advised them of the legal consequences of their execution and tendering of the Judgment Documents and that their waiver of objections, defenses, claims, counterclaims, crossclaims, or offsets, of any kind whatsoever, has been given with full knowledge and acknowledge of the legality of the Judgment Documents.

(d)     Yippy and Granville further acknowledge that Plaintiff's release in favor of Defendants, as described in Paragraph 6 of this Agreement, in addition to all other terms in this Agreement, also shall be contingent upon Yippy and Granville executing and agreeing to the terms and conditions of Paragraph 3 and as otherwise set forth in the Judgment Documents.

(e)     Yippy and Granville further agree that should the Judgment Documents be rejected by a Court or County Clerk, for any reason, or should the Court or County Clerk decline to enter judgment in Plaintiff's favor on such documents, Yippy and Granville shall, at their own expense, promptly cooperate and execute and deliver all such different or additional documents and do such things, as may prove necessary in order to have the judgment entered, consistent with the purpose of this Agreement.  Plaintiff may then record and enforce the judgment against Yippy and Granville, jointly and severally, in the manner and to the extent allowed by law.

(f)     If, prior to making the full payment of the Settlement Amount, Yippy or

8

Granville voluntarily files or has failed against it or him a petition in bankruptcy, then, in such event, the debt hereunder shall be the full and unpaid balance of the Settlement Amount, less payments received and cleared, the Settlement Amount shall be deemed to have been released from escrow and delivered to Plaintiff immediately prior to the filing of such petition(s) and Plaintiff shall have the right to immediately seek collection of such Settlement Amount against Yippy and Granville.

4.      Security.  The parties acknowledge and agree that Plaintiff has filed a UCC-1 in favor of Plaintiff, securing Yippy's obligation to make certain payments that are the subject of the Yippy Action.  Upon payment of all of the Initial Payment and Installment Payments, Plaintiff shall provide Yippy with an executed UCC Financing Statement Amendment (Form UCC-3).

(a)     Nothing in this Paragraph 4 of this Agreement shall be construed as, or deemed to be, a limitation or waiver of any of Plaintiff's rights and remedies, in law or in equity, with respect to any alleged default under the terms of this Agreement, including but not limited to Plaintiff's rights seek entry of the Confessions of Judgment or to recover all attorneys' fees and costs incurred in connection with filing the Confessions of Judgment and enforcing the confessed judgments and collecting same. Yippy and Granville hereby acknowledge that they are making a voluntary, knowing and intelligent waiver of their right to notice or demand and any objection, defense, or offset they may now or in the future have to any term or condition in this Paragraph 4.

5.      Causes of Actions, Debts and Liabilities.  Defendants covenant and represent that

they shall hold Plaintiff free and harmless, and shall indemnify Plaintiff for any costs, damages, charges or liabilities arising from the payment of any debts, charges or liabilities previously incurred (except as set forth in this Agreement) or hereafter contracted by that party for which the other party, their legal representatives or their property or estate may become liable to pay, for or by reason of any act or omission of the party incurring the indebtedness, and against any necessary expenses arising therefrom.

6.    <u>Releases.</u>

(a)    Upon receipt and clearance of all payments required under Paragraph 1, which is a condition precedent to Plaintiff's release being effective, Plaintiff releases and forever discharges Defendants, their agents, heirs, assigns, executors and administrators, officers, directors, employees, current attorneys, shareholders, partners, members, affiliates, subsidiaries and parent companies from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands of every kind and nature, in law, equity, or otherwise, known or unknown, disclosed or undisclosed, suspected or unsuspected, including, without limitation, any claims for damages, actual or consequential, past, present, or future, which arise out of or in any way relate to the Yippy Action and Granville Action.  Plaintiff expressly does not release or waive any claims that it may have against Yippy or Granville for payment pursuant to the concurrently executed Judgment Documents or to enforce any provision of this Agreement and the Exhibits thereto.

(b)    Yippy and Granville, for themselves and their agents, heirs, assigns,

10

executors and administrators, officers, directors, employees, attorneys, shareholders, partners, members, affiliates, subsidiaries and parent companies, release and forever discharge Plaintiff, its agents, heirs, assigns, executors and administrators, officers, directors, employees, current attorneys, shareholders, partners, members, affiliates, subsidiaries and parent companies, from all rights, liabilities, damages, actions, causes of action, counterclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, claims, and demands, of every kind and nature, in law, equity, or otherwise, known or unknown, disclosed or undisclosed, suspected or unsuspected, including, without limitation, any claims for damages, actual or consequential, past, present, or future, which arise out of or in any way relate to the Yippy Action and Granville Action. The foregoing release, however, shall not be deemed to have released any rights or obligations of the Parties under this Agreement and the Exhibits thereto.

7.    <u>No Admission of Liability</u>.  This Agreement constitutes a compromise settlement of disputed claims and shall not be deemed or construed to be an admission of liability by any of the Parties at any time for any purpose.

8.    <u>Representation and Covenant Not to Sue</u>.  The Parties hereby represent and agree that, with the exception of the papers filed in the Yippy Action and the Granville Action, they have not filed or pursued, and will not file or pursue, any charges, suits, complaints, grievances, or other actions which assert, arise out of or are in any way related to the claims released under this Agreement; provided, however, that this paragraph shall not apply to any action or claim to enforce the terms of this Agreement or from responding to any inquiry about this settlement or

11

its underlying facts by the Securities and Exchange Commission, FINRA, federal or state agency, any other self-regulatory organization.

9.      Representation and Covenant Not to Solicit Litigation.   Yippy and Granville agree and covenant that, within five (5) business days of executing this Agreement, Yippy and Granville will provide Plaintiff with a document evidencing their respective written directions to Defendants' former attorney, John H. Snyder PLLC, to remove from online posts, marketing materials, blogs, websites, website forums, bulletin boards, chatrooms, or message boards, content that does or intends to solicit clients or potential clients who have: (a) engaged in business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies; or (b) invested in or engaged in other business with any company that also has done business with Plaintiff, its agents, officers, directors, employees, current attorneys, partners, members, affiliates, subsidiaries and parent companies, and Yippy and Granville shall obtain Mr. Snyder's written confirmation of his compliance with such directions within ten (10) business days of executing this Agreement and provide same to Plaintiff's Counsel.

10.     Non-disparagement.   Each Party agrees and covenants that Each Party will not, at any time, disparage or make negative or false statements about any other Party or any subsidiary or affiliated entity of any Party and any officer, shareholder, director, employee, agent, or attorney of any Party in their individual or representative capacities.   Each Party shall report, in accordance with the notice provisions set forth under the Agreement, to each other Party any actions or statements that are attributed to a Party that the reporting Party believes are disparaging or false.   The reporting Party may take actions consistent with the provision for breach of this Agreement, except as they relate to Paragraphs 1 or 3, should it determine that a

12

Party has disparaged or made false statements about the reporting Party. The foregoing shall not prohibit or limit a Party's ability to respond truthfully to any inquiries from or satisfy any disclosure requirements to any governmental or regulatory authorities.

11.    <u>Yippy and Granville Affidavits</u>. At the time of execution of this Agreement, Yippy and Granville shall jointly execute an affidavit averring that, having conducted and completed all discovery in the Yippy Action, neither Yippy, Inc. nor Granville have identified or have personal knowledge of any documents or information to substantiate their allegations or arguments made in connection with the Yippy Action and Granville Action relating to shorting, "naked" shorting, bribery, or violations of the securities laws by Hanover, Magna Holdings, or any of its affiliated or subsidiary companies or their officers, directors, principals, employees, or agents. The affidavits shall be annexed collectively to the final settlement agreement as Exhibit C. The parties acknowledge and agree that if the Granville Action is restored by Plaintiffs to active, pre-note of issue status before the Honorable Barry R. Ostrager, J.S.C., the affidavit in this Paragraph shall not be used by the parties in the Granville Action in discovery, motion practice, or at trial and shall be deemed inadmissible in the Granville Action for any purposes.

12.    <u>Press Release</u>. At the time of execution of this Agreement, Yippy and Granville shall jointly shall jointly issue a press release, in a form similar Exhibit D hereto, and which shall be pre-approved by Plaintiff and Defendants, reflecting resolution by settlement of the Yippy Action and also stating that "During the course of discovery in the litigation, the parties exchanged documents and information shedding additional light on the underlying finances in dispute, and, have now entered into a financial settlement pursuant to which Yippy shall make certain payments to Hanover."

13.    <u>Modifications</u>. Except as otherwise provided in this Agreement, no subsequent

13

alteration, amendment, change, or addition to this Agreement, or the documents annexed hereto and executed contemporaneously herewith, shall be binding upon the parties hereto, unless in writing and signed by the party against whom enforcement of the alteration, amendment, change or addition is sought.  Neither this Agreement nor any provisions hereof shall be amended, waived, or modified or deemed amended, waived, or modified except in writing, identifying each particular provision amended, waived, or modified and duly subscribed and acknowledged by all parties with the same formality as this Agreement, except as expressly provided herein. No oral representation shall constitute an amendment, waiver, or modification even if substantially and detrimentally relied upon.

14.    <u>Binding Effect</u>.  This Agreement and all the obligations and covenants hereunder shall be binding upon the parties hereto, their heirs, executors, administrators, legal representatives, and assigns and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, and assigns.

15.    <u>Non-Waiver</u>.  The failure of Plaintiff to strictly enforce any or all of the terms or provisions of this Agreement shall not result in a waiver of Plaintiff's right to strictly enforce any and all of the terms and conditions of this Agreement, and shall not operate to prevent or estop Plaintiff from thereafter insisting upon strict performance of such terms or provisions.

16.    <u>No Presumptions</u>.  This Agreement shall be construed without regard to any presumptions against the party causing the same to be prepared.

17.    <u>Governing Law; Forum</u>.  This Agreement shall be governed by and conformed in accordance with the laws of the State of New York without regard to the New York's conflict of law provisions.  Any actions, lawsuits, or other proceedings to enforce this Agreement shall be commenced and maintained only in the New York State Courts sitting in the City, County and

State of New York, or, as to entry of the Confessions of Judgment, any court of competent jurisdiction as set forth in Paragraph 3, and Defendants irrevocably consent and submit to the personal jurisdiction of such Courts for the purposes of enforcing this Agreement.

18.    Counterparts.  This Agreement may be executed in counterparts, each of which, when all parties have executed at least one such counterpart, shall be deemed an original, with the same force and effect as if all signatures were appended to one instrument, but all of which together shall constitute one and the same Agreement.

19.    Authority.  Each of the Defendants signing this Agreement represents and warrants, on behalf of himself/herself and of the party for whom he/she purports to sign, that he/she is duly authorized to enter into this Agreement.

20.    Severability.  Should any provision of this Agreement be declared or be determined by any court or tribunal to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be severed and deemed not to be part of this Agreement.

21.    Effectiveness of Agreement.  This Agreement is not effective and shall not be binding upon the parties hereto, until it, and all documents annexed hereto as Exhibits, are fully executed and delivered to counsel for Plaintiff.

22.    Representations.  Each of the parties to this Agreement acknowledge and represent that: (a) they have read the Agreement; (b) they clearly understand the Agreement and each of its terms; (c) they fully and unconditionally consent to the terms of this Agreement; (d) they fully understand the terms, covenants and conditions of this Agreement; (e) have been fully and independently advised of their respective legal rights, remedies and obligations arising out of or relating to the Yippy and Granville Actions, Judgement Documents, UCC-1, and UCC-3;

15

(f) they have had the benefit and advice of counsel of their own selection; (g) they have sought and obtained legal advice independently of each other; (h) that they have been duly apprised of their respective legal rights and each has had the provisions the applicable laws hereof fully explained to them, and that all the provisions hereof, as well as all questions pertaining thereto, have been fully and satisfactorily explained to them; (i) that they have given due consideration to such provisions and questions; (j) they have executed this Agreement freely, with knowledge, and without influence, force, coercion or duress of whatever nature; (k) they have not relied upon any other representations, either written or oral, express or implied, made to them by any person; (l) the consideration received by them has been actual and adequate; and (m) and they have the authority to execute this Agreement.

23.     Entire Understanding.  This Agreement contains the entire understanding of the parties with regard to the subject matter hereof.  The parties acknowledge that there are no representations, warranties, promises, or undertakings not herein set forth.  The Paragraph titles are for the purpose of convenience only, and shall not be deemed to reflect any intent of the parties or be a part of this Agreement.

24.     Additional Documentation.  The parties agree to promptly cooperate and execute any further documentation that may be required from time to time for the purpose of giving full effect to the provisions and intent of this Agreement.

25.     Binding Effect.  This Agreement and all the obligations and covenants hereunder shall bind the parties hereto, their heirs, executors, administrators, legal representatives, and assigns and shall endure to the benefit of their respective heirs, executors, administrators, legal representatives, and assigns.

26.     Notice.  Unless otherwise provided herein, any and all notices provided pursuant

to this Agreement shall be in writing and delivered by nationally recognized overnight courier service, for next day delivery, to the address of the party to whom notice is being provided as set forth below:

If to Plaintiff:

Daniel Scott Furst, Esq.
Sichenzia Ross Ference Kesner LLP
61 Broadway, 32nd Floor
New York, New York 10006

If to Defendants:

Mark L. Cortegiano, Esq.
Law Offices of Mark L. Cortegiano, Esq.
65-12 69th Place
Middle Village, NY 11379

The parties may designate such other addresses to receive Notice by advising the other parties of same in writing.

27.     Warranty Re Non-Assignment.  The individuals signing this Agreement and the Parties represent and warrant that they have full and complete authority and authorization to execute and effect this Agreement and to take or cause to be taken all acts contemplated by this Agreement.

28.     Short Form Settlement Order.  The parties agree that, subject to the Court's approval or other instruction, a short form Decision and Order that refers to and incorporates by reference this Agreement and Release will be entered in lieu of this Agreement and Release. The parties further acknowledge and agree that should any Defendant breach this Agreement and Release, Hanover shall be entitled to file this Agreement and Release pursuant to any terms of the Agreement and Release without further notice to Defendants.

17



*IN WITNESS WHEREOF*, the parties hereto have hereunto set their respective hands and seals as of the __10__ day of February, 2017, and they hereby acknowledge that the provisions of this Agreement and Release shall be binding upon their respective heirs, assigns, executors and administrators.

YIPPY, INC.

By: _____            _____

Richard Granville                                          Richard Granville
Its: Chief Executive Officer

HANOVER HOLDINGS I, LLC

_____
By: Joshua Sason
Its: CEO

SO ORDERED:

_____
HON. BARRY R. OSTRAGER, J.S.C.

### Acknowledgements

STATE OF GEORGIA            )
                                                 ) ss.:
COUNTY OF COBB )

On February _10_, 2017, before the undersigned, a Notary Public in and for the said County and State, personally appeared Richard Granville, of Yippy, Inc., and known to me by satisfactory evidence to be such persons, personally appeared and acknowledged they have read and executed the foregoing Agreement and Release and duly acknowledged to me that they executed the same.

Witness my hand and official seal.

_____
Notary Public in and for said County and State

18

*IN WITNESS WHEREOF*, the parties hereto have hereunto set their respective hands and seals as of the __10__ day of February, 2017, and they hereby acknowledge that the provisions of this Agreement and Release shall be binding upon their respective heirs, assigns, executors and administrators.

YIPPY, INC.

By: _____          _____
Richard Granville                             Richard Granville
Its: Chief Executive Officer

HANOVER HOLDINGS I, LLC

_____
By: Joshua Sason
Its: CEO

SO ORDERED:

_____
HON. BARRY R. OSTRAGER, J.S.C.

**BARRY R. OSTRAGER**
JSC

Acknowledgements

STATE OF GEORGIA        )
                        ) ss.:
COUNTY OF COBB )

On February _10_, 2017, before the undersigned, a Notary Public in and for the said County and State, personally appeared Richard Granville, of Yippy, Inc., and known to me by satisfactory evidence to be such persons, personally appeared and acknowledged they have read and executed the foregoing Agreement and Release and duly acknowledged to me that they executed the same.

Witness my hand and official seal.

_____
Notary Public in and for said County and State

STATE OF GEORGIA     )
                            ) ss.:
COUNTY OF COBB )

On February _10_, 2017, before the undersigned, a Notary Public in and for the said County and State, personally appeared Richard Granville, and known to me by satisfactory evidence to be such persons, personally appeared and acknowledged they have read and executed the foregoing Agreement and Release and duly acknowledged to me that they executed the same.

Witness my hand and official seal.

_____
Notary Public in and for said County and State

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK )

On February _10_, 2017, before the undersigned, a Notary Public in and for the said County and State, personally appeared Joshua Sason, of Hanover Holdings I, LLC, and known to me by satisfactory evidence to be such persons, personally appeared and acknowledged they have read and executed the foregoing Agreement and Release and duly acknowledged to me that they executed the same.

Witness my hand and official seal.

_____
Notary Public in and for said County and State

**MICHAEL SENZ**
**Notary Public-State of New York**
**No.01SE6114952**
**Qualified in New York County**
**Commission Expires Aug. 30, 2020**

19

EXHIBIT
2

# Death-Spiral Convertible Financier Has a Lot of Fun

You too can party with rock stars if you can figure out 3(a)(10) exchanges.

By Matt Levine

13   March 12, 2015, 6:47 PM EDT

I frequently remind you not to take anything I say as legal advice, but I guess it's fine to take legal advice from this guy:

> The financing technique is legal as long as the debts that are being paid off are real and the financier doesn't kick any of the money from the stock sale back to the company, according to Mark Lefkowitz, another penny-stock financier who pleaded guilty in 2012 to breaking those rules. "The bottom line is, it's supposed to be used for bona fide conversions of debt to equity," says Lefkowitz, who's cooperating with the FBI. He cut an interview off quickly, saying he was due to be sentenced soon and needed to check with his FBI handler before talking.

I mean, he should know what techniques are legal, right? Since he had to, like, hop off the call to go to prison for doing the other ones?

That's from Zeke Faux's amazing Bloomberg Businessweek story <http://www.bloomberg.com/news/articles/2015-03-12/josh-sason-made-millions-from-penny-stock-financing> about Joshua Sason, a 27-year-old Long Islander who runs Magna Group, "which he describes as a global investment firm," though Faux describes it as "a pawnshop for penny stocks." Even outside of his financing techniques, Sason's life is shall we say colorful (lingerie-model girlfriend, high-school rock stardom, budding movie career, "plan to import sand from Israel and sell it as a collectible called 'Sand from the Holy Land'"). But here let's focus on the financing techniques.

Broadly speaking, the goal of these techniques is this:

1.  A small troubled public company wants money.

2.  All it has to exchange for that money is its own stock.

3.  It is shall we say inconvenient for the company to do a regular underwritten public offering of its stock, because such an offering would require a lot of expensive and awkward disclosure of just how troubled the company is, or because it would be hard to find buyers for all that stock at once, or both.

4.  And it is not legal for the company to just secretly sell stock into the market without doing a public offering.

5.  So it decides to place the stock privately with a smart financing source.

6.  It's not like the smart financing source wants the stock either! You don't get to be a smart financing source by buying penny stocks of troubled companies and holding onto them.

7.  But "company sells stock to smart financier, who then sells it to the public" is not a good way to get around No. 4: The securities laws cover not only sales directly by companies to the public, but also sales by companies to the public by way of an "underwriter," and a financier who buys the stock only to sell it a minute later looks, to securities regulators, like an underwriter.

8.  So you need to find a way to get stock into the financier's hands in a way that makes him comfortable he can get it out of his hands and into the hands of … is it uncharitable to say "the unsuspecting public"?

Now I should pause here and say that this goal -- get stock from company to financier to public, get money from public to financier to company -- makes sense for the company (which gets money), and for the financier (who is well compensated for providing the financing), but is less obviously appealing to the public (who buys the risky stock without the disclosure of a public offering), and is very obviously not appealing at all to the Securities and Exchange Commission. The main point of the securities laws is to prevent companies from raising money from the unsuspecting public without registration and disclosure, so the SEC takes sort of a dim view of inventive efforts to do that. 1

So there is a long-running game in which penny-stock financiers find ways to get stock to the public, the SEC shuts them down, the financiers find new ways, etc. Here's a simple classic: The financier sells the company's stock short, selling X shares of stock into the market for $Y of proceeds. *Then* he gives the company $Z (Z << Y), the company gives him X shares of stock, and the financier closes out his short sale with the shares from the company. The financier is never long shares, and is never "really" short either, because he's arranged with the company to get shares to close out his short. So he's never at risk. This is a good trade, but also super illegal. 2

A variant on this classic uses convertible bonds. The company sells the financier a convertible bond in a private placement. The financier sells stock short, until he has sold enough shares to recoup his investment in the bond and make a profit. Then he converts the bond, gets the shares and closes out his short. Here the financier is at a bit more risk, because he does hold onto the convertible bond for at least a little while, and if the company goes bankrupt between the time that he gives it the money and the time that he finishes short selling and converts, he's out of luck. But he at least has a debt claim, and is never fully at risk on the stock. A nice thing about this approach is that this paragraph loosely describes convertible arbitrage, in which investors buy convertible bonds and hedge them by shorting stock. And that's totally legal, most of the time. But when it's clearly done with the intent of evading the securities laws -- with the intent of pumping out stock from company to public with only a fleeting stop-over chez the financier -- then it's not. It's a bit of a know-it-when-you-see-it kind of thing. [3]

One bad sign is a "death spiral" convertible, one that converts into a fixed *value* rather than a fixed *number* of shares. Normal convertible arbitrage is practiced with bonds with fixed conversion rates. One $1,000 bond converts into, say, 50 shares, whatever the price of the stock ends up being, that sort of thing. But a $1,000 convertible bond that converts into $1,000 -- or, for that matter, $2,000 -- *worth of stock*, whatever the price of the stock ends up being, is a much more dangerous creature. For one thing, it tends to push down the stock price: The financier sells stock, the stock price drops, the financier is guaranteed more stock, so he sells more, etc. until the stock price gets near zero. [4]  Also, though, when the financier is guaranteed a fixed amount of money, he's not taking any stock-price risk, and he looks a lot more like he's just transmitting shares from the company to the public. So buying a death-spiral convertible, shorting a lot of stock and then converting is very much frowned upon. [5]

But that can be fixed! One apparently viable approach is to buy a death-spiral convertible, *not* short the stock, wait six months and then convert it. Six months is a mildly magical time period for the securities laws: If you buy a security in a private placement from a company and resell it to the public immediately, you tend to be considered an "underwriter" and get into trouble under step 7 in my list above. (The specific form of trouble that you get in, by the way, is "rescission liability": People who bought the stock from you get to sell it back to you at the price they paid, which, in a death spiral, could get ugly for you.) But if you buy the security in a private placement, *wait six months* and then sell to the public, you are generally not treated as an underwriter <http://www.sec.gov/investor/pubs/rule144.htm> , and can sell freely. [6]

This seems to have been one of Sason's strategies, e.g. with a company called Pervasip. From Faux's article:

> On the surface, the $75,000 loan Magna offered seemed all right. It was in the form of an "8 percent convertible promissory note," meaning it asked for an 8 percent return and gave Sason the right to convert it into stock. The fine print explained that if Pervasip didn't pay back the money within six months, the lender could convert at a 45 percent discount to the market price. So, no matter where Pervasip's stock was trading, the company had to give Magna shares that were worth more than $136,000—an 82 percent return in just six months. Essentially, Magna locked in a fixed return.

On the other hand, Pervasip had to survive -- with a tradeable stock -- for six months. So Magna at least took some credit risk there.

There are some even weirder moves. Mark Lefkowitz, who was quoted above providing legal advice to Businessweek, used the rather recherché technique of a 3(a)(10) exchange, which explicitly lets a company do exactly the unregistered company-to-financier-to-public distribution of stock that is the goal of all these transactions. The catch is that the shares need to be issued "in exchange for one or more bona fide outstanding securities, claims or property interests," and a court needs to sign off on the terms of the exchange "after a hearing upon the fairness of such terms and conditions." [7]  Lefkowitz's problem <http://www.fbi.gov/sandiego/press-releases/2012/new-jersey-stock-trader-pleads-guilty-to-conspiring-with-san-diego-ceo-in-28-million-securities-fraud> was that the outstanding securities don't seem to have been all that bona fide, and he seems to have hidden some of the terms from the court. So that's why he's chatting with the FBI these days.

Sason seems to have done the 3(a)(10) exchange correctly:

> Magna's biggest score came in 2013, when it helped a Greek shipping company called Newlead avoid bankruptcy. The shipper, which once owned 15 tankers and container ships, was down to four vessels. It had enough cash to cover about a month of operating losses.
>
> The deal had a twist. Instead of giving Newlead a loan, Magna paid some of Newlead's lenders for the right to collect its old debts. After Magna sued Newlead to collect, the two companies quickly filed a settlement where Newlead agreed to give Magna discounted stock that it could sell right away. A New York state judge signed off on the arrangement.
>
> Sason said in an affidavit filed in the case that Magna, together with an unnamed partner, paid off $45 million of debt and received stock that it sold for $62 million—a $17 million profit before expenses.

Here is that affidavit <http://go.bloomberg.com/assets/content/uploads/sites/2/Newlead-affidavit.pdf> , which is quite an affidavit, as affidavits go! Here's the arrangement:

> Specifically, the Settlement Agreement provided that the total number of shares of Defendant's common stock to be issued to MGP would be equal to the sum of (i) the quotient obtained by dividing (A) $44,822,523.85, representing the total amount of the Claim, by (B) 62.5% of the volume weighted average price of NewLead's common stock over the Calculation Period (as defined below) and (ii) the quotient obtained by dividing (A) $120,000 of Hanover's legal fees and expenses incurred in connection with the Action, by (B) the volume weighted average price of NewLead's common stock over the Calculation Period, rounded up to the nearest whole share (the "VWAP Shares"). The "Calculation Period" was defined in the Settlement Agreement to mean the shorter of the following: (i) the 220-consecutive trading day period (subject to extension under certain circumstances set forth in the Settlement Agreement) commencing on December 9, 2013, the trading day immediately following the date of the initial issuance of shares of NewLead's common stock to MGP, and (ii) the consecutive trading day period commencing on December 9, 2013 and ending on the trading day that MGP shall have received aggregate cash proceeds from the resale of shares of Defendant's common stock equal to $61,750,970.29, representing the sum of (A) $61,630,970.29, which is equal to 137.5% of the total amount of the Claim, and (B) $120,000 of Hanover's legal fees and expenses incurred in connection with the Action.

And the stock was delivered in little drips over time:

> Pursuant to the terms of the Settlement Agreement approved by the Order, on December 6, 2013, NewLead issued and delivered to MGP, as an initial issuance, 3,500 shares (adjusted to give effect to certain reverse stock splits effected by NewLead) of NewLead's common stock, and the Calculation Period commenced on December 9, 2013, which was the trading day immediately following the date of the initial issuance of shares to MGP pursuant to the Settlement Agreement. Between on or about January 6, 2014 and June 12, 2014, NewLead issued and delivered to MGP an aggregate of 37,658,000 additional shares (adjusted to give effect to certain reverse stock splits effected by NewLead) of NewLead's common stock pursuant to requests made by MGP in accordance with the formula and procedures set forth in the Settlement Agreement.

So: NewLead gives Magna a little stock (less than one 10,000th of the eventual total). Magna sells it. NewLead gives Magna a little more stock. Magna sells it. This keeps going for *half a year.* At the end of that period, Magna has sold the stock for $61.75 million, 137.5 percent of what it paid for it (in the form of debt forgiveness). That's guaranteed by NewLead: If the stock goes down, NewLead just delivers more shares, until Magna has gotten its $61.75 million worth.

It goes without saying that this is what the stock did over that period:



Source: Bloomberg

Pay attention to the scale on that graph. Faux:

> *The financing may have saved Newlead as a company—it avoided bankruptcy and bought new tankers—but it ruined it as a stock. The company has been so thoroughly pillaged that if you'd bought $3 million of shares in March 2013, just before Magna invested, you'd be left with a dime. Adjusted for reverse splits, the shares trade for 20 billionths of a penny—$0.0000000002. Newlead did not respond to a request for comment.*

Now, of course, bankruptcy would have ruined the stock too. You can think of this trade as sort of a jury-rigged bankruptcy: Rather than file for bankruptcy, restructuring its debts in bankruptcy court and wiping out its shareholders, NewLead instead signed up to this trade, restructured its debts in state court, and wiped out its shareholders. Felix Salmon is a fan <http://fusion.net/story/103051/gigaoms-biggest-problem-it-stayed-private/> :

> *Thanks to Sason, Newlead managed to pay off $45 million in debt, avoided having to file for bankruptcy, and even bought new tankers. The share price was demolished, but that's always a risk in the stock market, and especially in penny stocks.*

That's true! It's not much comfort, though, to the person who bought $35,000 worth of stock in January and saw it trading for $31.50 in June. [8]  That person might feel a bit deceived. He might even think that the hearing at which the court heard from NewLead and Magna, and approved this trade as fair to both parties, could have inquired a bit further into the trade's fairness to NewLead's public stockholders -- who, if you squint, bought a lot of stock from the company without the registration statement that would otherwise be required.

This is obviously, always, a tension in the securities laws: It is good for companies to be able to get financing, and it is also good to protect investors from being sold stock without complete information. Where registration and full disclosure stands in the way of financing, something has to give. The SEC, being after all in the disclosure-regulation business, might have a bit of a bias for full disclosure. Sason, being after all in the financing business, has a bias for financing. So far Sason seems to be winning.

*This column does not necessarily reflect the opinion of Bloomberg View's editorial board or Bloomberg LP, its owners and investors.*

1. *Obviously there are a lot of specifically sanctioned exceptions for private offerings to accredited investors, etc. The point is, you're not supposed to cleverly invent your own exceptions.*

2. *Not legal advice! In particular, the SEC has lost registration-requirement claims <http://www.rkollp.com/newsroom-publications-52.html> in cases like this, which I find baffling, though it still has insider trading law as an avenue to shut this down: If you know the company will sell you shares, and you short in advance, then you're trading on material nonpublic information.*

3. *I could talk about delta as an indicator of good-faith convertible arbitrage, but probably shouldn't.*

4. *The Businessweek article has a good swirly graphic of the death spiral that captures this dynamic, and I commend it to you.*

5. *Here's a classic SEC case <http://www.sec.gov/news/press/2003-26.htm> in that vein, which accuses the financier of manipulation for shorting the stock. This is actually a little weird, if you think about it, because the financier doesn't care what price he gets for the stock, so he has no incentive to pound down the stock price (which is what you normally think of as manipulation). Rather, his incentive is to get all his shares out before converting. But that's a detail.*

6. *There are restrictions, including that the company really ought to be current on its securities filings. Also, I mean, good lord, don't take my advice on this.*

7. *Section 3(a)(10) of the Securities Act of 1933 (pages 12-13 here <https://www.sec.gov/about/laws/sa33.pdf> ).*

8. *That chart is split adjusted; the stock is currently at $0.022.*

To contact the author on this story:
Matt Levine at mlevine51@bloomberg.net <https://mail.google.com/mail/?view=cm&fs=1&tf=1&to=mlevine51@bloomberg.net>

To contact the editor on this story:
Zara Kessler at zkessler@bloomberg.net <https://mail.google.com/mail/?view=cm&fs=1&tf=1&to=zkessler@bloomberg.net>



# Michigan Business & Entrepreneurial Law Review

Volume 5 | Issue 1

2016

# 3(A)(10) Financing: New Predatory Financing Using the Securities Act

Thomas S. Glassman
*University of Michigan Law School*

Follow this and additional works at: http://repository.law.umich.edu/mbelr

 Part of the Administrative Law Commons, Business Organizations Law Commons, and the Securities Law Commons

## Recommended Citation

Thomas S. Glassman, *3(A)(10) Financing: New Predatory Financing Using the Securities Act*, 5 Mich. Bus. & Entrepreneurial L. Rev. 99 (2016).
Available at: http://repository.law.umich.edu/mbelr/vol5/iss1/5

This Note is brought to you for free and open access by the Journals at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in Michigan Business & Entrepreneurial Law Review by an authorized administrator of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

# 3(A)(10) FINANCING: NEW PREDATORY FINANCING USING THE SECURITIES ACT

*Thomas S. Glassman*

### ABSTRACT

*The Section 3(a)(10) exemption of the Securities Act of 1933 is meant to exempt securities transactions where a fairness hearing by a judge or government agency's ruling replaces the usual SEC registration requirements. Recently, there has been a rise in 3(a)(10) financing schemes, where a third party investor, what I call a "3(a)(10) financier," will offer to purchase the outstanding debts of a company from its creditors in exchange for discounted, and unregistered, shares of stock. In many cases these exchanges are done with no notification to current shareholders whose value falls precipitously when the 3(a)(10) financier begins not only selling, but through a common clause in these 3(a)(10) financing contracts, also demanding that the company issue more shares to them at any time. The companies who work with 3(a)(10) financiers have, in some cases, become complicit in the scheme in order to hide these transactions from investors who provide the liquidity for the 3(a)(10) financier sell-offs. I conclude that the SEC needs to provide updated guidance on Section 3(a)(10) as well as bring significant enforcement actions to curtail this budding predatory finance scheme.*

## I. INTRODUCTION

The Section 3(a)(10) exemption of the Securities Act of 1933[1] ("3(a)(10)") is meant to exempt securities transactions where a fairness hearing by a judge or government agency's ruling replaces usual registration requirements. Recently, there has been a rise in 3(a)(10) financing schemes, where a third party investor, a "3(a)(10) financier," offers to purchase the outstanding debts of a company from its creditors in exchange for discounted, and unregistered, shares of stock. In traditional stock issuances, a company must file a registration statement describing the company's properties and business, the security to be offered, information about the management of the company, and financial statements certified by independent accountants.[2] However, a 3(a)(10) settlement simply requires that an action be brought against a company for "outstanding se-

---

1. Securities Act of 1933 §3(a)(10), 15 U.S.C. §77c(a)(10) (2012) ("Except with respect to a security exchanged in a case under title 11, any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.").

2. SECURITIES AND EXCHANGE COMMISSION, REGISTRATION UNDER THE SECURITIES ACT OF 1933 (2011).

curities, claims, or property interests" after which, in a fairness hearing, a judge or agency must accept or reject the terms and conditions of the settlement as "fair" to "all persons to whom it is proposed to issue the securities."[3] Those issuing the securities and those who already own the securities are afforded no such protection.

This work explores the Section 3(a)(10) exemption in greater detail. Part I discusses the background and history of the 3(a)(10) exemption. Part II introduces the modern trend of 3(a)(10) financing for small public companies. Part III discusses some of the harms of 3(a)(10) financing schemes including who 3(a)(10) financing schemes hurt. Part IV discusses the possible violations of 3(a)(10) financing schemes focusing specifically on (1) pre-settled lawsuits, (2) inequities within the settlement agreements and the probability such inequities will be accurately assessed by the court during a fairness hearing, (3) timing problems related to the fairness hearings, and (4) whether the exchanged shares may be freely tradable afterward without registration or exemption. Part V explores whether the small businesses entering into 3(a)(10) transactions may also be violating securities laws. Finally, Part VI discusses some of the potential actions that could be taken in order to better reflect the legislative intent of Section 3(a)(10) and to stop what is quickly becoming a corrupt practice. Part VI includes two recommendations for the SEC. First, the Commission must develop its guidance materials to include specific regulation about this area. This guidance should comment specifically on the use of 3(a)(10) financing schemes and whether or not, in their view, enforcement actions will be brought during the process and their interpretation of this growing practice. Next, the SEC should bring enforcement actions under Sections 5, 12, and 13 of the Securities Act against both the 3(a)(10) financier and the company for violations related to the practice of 3(a)(10) financing. Finally, it is necessary to gain congressional support to amend the Securities Act to place 3(a)(10) back into Section 4 of the 1933 Act where it was originally written and to add language in an effort to curtail the potentially unscrupulous practice of 3(a)(10) financing.

## II. Legislative History and Early Commentary

In order to promote disclosure,[4] Section 5 of the Securities Act requires that all securities[5] offered or sold[6] in interstate commerce must be subject to an effective registration statement filed with the Securities and

---

3.  *See* Securities Act of 1933, *supra* note 1.

4.  H.R. Rep. No. 73-85, at 3 (1933) (President Roosevelt emphasized the importance of disclosure upon saying, "[t]here is . . . an obligation upon us to insist that every issue of new securities . . . shall be accompanied by full publicity and information, and that no essentially important element attending the issue shall be concealed from the buying public.").

5.  *See* Securities Act of 1933 § 2(a)(1) ("The term 'security' means any note . . . entered into on a national securities exchange relating to").

6.  *Id.* § 2(a)(3) ("The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value.").

Exchange Commission ("SEC") and issuers must deliver a prospectus to investors unless the transaction is exempted by a specific provision of the Securities Act.[7] Section 3, entitled "Exempted Securities," and Section 4, entitled "Exempted Transactions," provide the exemptions from registration requirements.[89] As it is currently written, the 3(a)(10) exemption exempts:

> [A]ny security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.

15 U.S.C. § 77c(a)(10). Section 3(a)(10).

The 3(a)(10) exemption is unique in that the disclosure to investors must be deemed "fair" by an objective decision maker rather than disclosing information directly to investors and letting them fend for themselves. Congress noted that "reorganizations carried out without such judicial supervision possess all the dangers implicit in the issuance of new securities and are, therefore, not exempt from the act."[10] A year later in March of 1935, the SEC released a statement saying that the requirement of a fairness hearing is "essential" to the exemption as it is the court who stands in the place of "those who are to receive the securities or to other security holders of the issuer, or . . . the public," and decides whether the provisions of the proposed transaction are unfair.[11]

The legislative history of Sections 3 and 4 indicates concern for the reorganization of financially troubled businesses.[12] Nothing in the congressional debates or reports suggest an exemption of mergers and acquisi-

---

7. *Id.* § 5.

8. *See id.* §§ 3-4.

9. Louis Loss, Securities Regulation 709 (2d ed. 1961).

10. H.R. Rep. No. 73-85, at 16 (1933).

11. Securities Act Release No. 312 1935 WL 29346, Fed. Sec. L. Rep. (CCH) ¶ 2181 (Mar. 15, 1935) ("This interpretation [that authorities who hold fairness hearings must have express authority of law] seems necessary to give meaning to the express requirement of a hearing upon the fairness of such terms and conditions, which must subsume authority in the supervisory body to pass upon the fairness from the standpoint of the investor, as well as the issuer and consumer, and to disapprove terms and conditions because unfair either to those who are to receive the securities *or to other security holders of the issuer, or to the public*. This requirement seems the more essential in that the whole justification for the exemption afforded by section 3 (a) (10) is that the examination and approval by the body in question of the fairness of the issue in question is a substitute for the protection afforded to the investor by the information which would otherwise be made available to him through registration.") (*emphasis added*).

12. H.R. Rep. No. 85 (1933), at 6.

tions of financially healthy companies, or for litigants who intend to use it to distribute unregistered shares as part of a compromise settlement.[13]

## Part II: *Lefkowitz* and the Birth of 3(a)(10) Financing

Over its history, the 3(a)(10) exemption has been used for mergers,[14] reorganizations of companies, and settlements of private litigation. Over time, the SEC has issued no-action letters and guidance to interpret its view of when the use of 3(a)(10) is appropriate.[15] Further, the SEC guidance seems to suggest a very broad use of the 3(a)(10) exemption based on the following conditions[16]:

    a.  The securities must be issued in exchange for securities, claims, or property interests; they cannot be offered for cash.

    b.  A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange.

    c.  The reviewing court or authorized governmental entity must:

        i.  find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued; and

        ii.  be advised before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.

    d.  The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction.

    e.  A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.

    f.  The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange.

    g.  Adequate notice must be given to all those persons.

    h.  There cannot be any improper impediments to the appearance by those persons at the hearing.

In *Lefkowitz*,[17] the SEC alleged that private litigation settlements using the 3(a)(10) exemption were for "capital raising," which was an "improper

---

13.    7 J. William Hicks, Exempted Transactions Under the Securities Act of 1933 § 3:2 (2d ed. 2001) ("However, the absence of legislative history has not served as an impediment and . . . exemption's protection has in recent years spread into these two areas.").

14.    *See e.g.*, E. Thom Rumberger, Jr., The Acquisition and Sale of Emerging Growth Companies: The M&A Exit § 6:17 (2d ed. 2009).

15.    Revised SEC Staff Legal Bulletin No. 3 (CF) (November 1, 1999); *See* SEC Staff Legal Bulletin No. 3A (CF) (June 18, 2008); *See also No-Action, Interpretive and Exemptive Letters, 3(a)(10)–Exemption for Exchanges After a Fairness Hearing*, Securities & Exchange Commission (Nov. 17, 2015), http://www.sec.gov/divisions/corpfin/cf-noaction.shtml #3a10.

16.    SEC Staff Legal Bulletin No. 3A, *supra* note 15.

17.    Sec. & Exch. Comm'n v. Lefkowitz, Litigation Release No. 22896 2013 WL 6794148 (Dec. 23, 2013), http://www.sec.gov/litigation/litreleases/2015/lr23206.htm [hereinafter Lefkowitz Litigation Release].

use" of the exemption.[18] The SEC stated in its complaint that Lefkowitz "developed an illegal strategy for penny stock issuers to pay off past due debts while, at the same time, raising additional capital through improper use of 3(a)(10)."[19] The SEC went on to state that "the Section 3(a)(10) exemption is not available where . . . certain terms and conditions of the settlement are not presented to the court for consideration at a fairness hearing; nor is the exemption available for capital raising."[20]

According to the SEC, the plan began in 2004, when Unico (the company issuing the stock) issued at least seventeen convertible debentures to Lefkowitz operated companies which allowed the companies to convert the debentures and accrued interest in shares of common stock at fifty percent of the closing bid price.[21] If either party requested the conversion, Unico was required to issue unrestricted shares to the debt holder, either through a transaction pursuant to a registration statement or the application of an exemption from registration.[22] At the time, Unico was a Business Development Company under the Investment Company Act of 1940 ("Company Act") and, as a result, was allowed to issue securities without filing a registration statement pursuant to the exemption from registration provided in Regulation E of the Securities Act.[23] When Unico withdrew its status as a Business Development Company, it no longer could issue unrestricted securities.[24] Lefkowitz was left in a bind as Unico was unable to pay back the debt or convert the debt into shares of common stock.[25]

Lefkowitz sought the assistance of a New York City attorney familiar with filing registration statements for penny stock issuers to determine if Unico could file a registration statement with the SEC in order to again issue shares to convert the debentures.[26] The law firm advised Lefkowitz that a registration statement could take at least eighteen months to draft and file, cost a significant amount of money, and may not be declared effective by the SEC.[27] The debentures, which were only six months in length, would surely mature by this time.[28] Lefkowitz and his counsel then discussed the option of potentially filing lawsuits against Unico for failure to "satisfy its obligations" and settling those lawsuits with shares issued under the 3(a)(10) exemption.[29] The law firm introduced Unico to inde-

---

18. Complaint for Injunctive Relief at 2, Sec. & Exch. Comm'n v. Lefkowitz, No. 8:12-CV-1210T35MAP (M.D. Fla. May 30, 2012).

19. *Id.*

20. *Id.*

21. *Id.* at 10.

22. *Id.*

23. *Id.* at 10–11.

24. *Id.* at 11.

25. *Id.*

26. *Id.*

27. *Id.*

28. *Id.* at 10.

29. *Id.* at 11–12.

pendent counsel in Florida to represent Unico in "pre-settled lawsuits" filed by Lefkowitz[30] and 3(a)(10) financing was born.

In a three-year span, more than fifty pre-settled lawsuits were filed under the pretext of settling past-due debts owed by the issuers.[31] For Unico alone less than $4 million in debt was converted into 8,921,335,034 shares, which, at the time they were issued, had a market value of $28,331,307.22.[32] The issuer would execute a settlement agreement with the financier pursuant to an agreement to issue unrestricted common stock to the financier at a substantial discount to the prevailing market price, purportedly to retire the past due debt.[33] The number of settlement shares reflected in the settlement agreement was always based on a negotiated discount of the market price and/or a multiple of the face value of the debt, which, in turn, meant that shares had an actual market value on the date of the settlement agreement which exceeded the amount of the past due debt.[34] Following a fairness hearing, the 3(a)(10) exemption was granted and unrestricted shares were issued to the financier who quickly sold the shares on the open market to public investors unaware of the dilutive effects of the new stock issuances.[35] The financier subsequently remitted monies to the penny stock issuer that, to the SEC, made it "a capital raising transaction."[36] On February 10, 2015, the SEC announced it had settled its civil action against all parties "arising from their respective roles in the illegal unregistered distribution of billions of shares of penny stocks."[37]

Private actions involving companies in 3(a)(10) financing arrangements have exemplified the continued complexities of such schemes.[38] Orders granting approval of settlements pursuant to 3(a)(10) show "purchase agreements" of debts made by companies who then quickly file lawsuits in

---

30. *Id.* at 12.

31. *Id.* at 2.

32. *Id.* at 17.

33. *Id.* at 3.

34. *Id.*

35. *Id.*

36. *Id.*

37. Sec. & Exch. Comm'n v. Lefkowitz, Litigation Release No. 23206, (Feb. 24, 2015) [hereinafter Lefkowitz 23206] https://www.sec.gov/litigation/litreleases/2015/lr23206.htm.

38. *Compare* ScripsAmerica v. Ironridge Global, 56 F. Supp. 3d 1121 (C.D. Cal. Nov. 3, 2014) (ruling against a company alleging claims of securities fraud, breach of contract, and tortious bad faith and seeking declaratory relief against a 3(a)(10) financier) *with* Ironridge Global v. Green Automotive, No. BC526570 (Cal. Super. Ct. Nov. 1, 2013) (ruling in favor of a company that completed a settlement agreement with a 3(a)(10) financier. The court awarded a temporary restraining order restricting the ability of the financier to convert their outstanding debt into additional shares per the settlement agreement. In its opposition to a motion enforcing the shares being issued, the company (defendant) claimed that the 3(a)(10) financier (plaintiff) first asked for forty million additional shares, then fifty five million, and then finally six billion shares, six times the authorized capitalization of the company.).

order to settle for shares.[39] Further, many 8-K and 10-Q/K filings since 2011 describe transactions strikingly similar to *Lefkowitz*.[40] Though the settlement agreements have different terminologies, many have similar terms and are completed in a similar way to *Lefkowitz*.[41]

In a basic 3(a)(10) arrangement, a 3(a)(10) financier brings a lawsuit against the company that will be receiving the financing. Within the initial lawsuit documents, it is stipulated that the 3(a)(10) financier is to be issued unrestricted common stock pursuant to a reduction in price from the current market value.[42] According to the SEC filings of several companies, millions,[43] and sometimes billions,[44] of shares are issued to the financier in "tranches" which can be requested at any time by the financier as long as the issuance is below either 4.99%[45] or 9.99%.[46] In press releases by companies who work with 3(a)(10) financiers, it is indicated they are using the 3(a)(10) investment for "funding."[47] Further, similar to *Lefkowitz*, companies are issuing more value in stock than the value of the debt they originally sold to the 3(a)(10) financier.[48] From start to finish, these lawsuits

---

39. *See, e.g.*, Court Docket Sheet, IBC Funds LLC, v Frontier Beverage Co. Inc., No. 2014 CA 002832, (Fla. Cir. Ct. June 4, 2014) (Bloomberg Law); Court Docket Sheet, IBC Funds LLC v. Healthy & Tasty Brands Corp., No. 2014-10463-CA-01, (Fla. Cir. Ct. Apr. 21, 2014) (Bloomberg Law).

40. *See e.g.*, Monster Arts Inc., Corporate Filing (Form 10-K/A) (Oct. 23, 2015); Advaxis, Inc., Corporate Filing (Form 10-Q) (Sept. 11, 2015); Epazz, Inc., Corporate Filing (Form 10-Q) (Aug. 17, 2015); Worthington Energy, Inc., Corporate Filing (Form 8-K) (Sept. 10, 2014); Jammin Java Corp., Corporate Filing (Form 8-K) (July 30, 2013); Stevia Corp., Corporate Filing (Form 8-K) (July 29, 2013).

41. Worthington Energy, Inc., Settlement Agreement and Stipulation (Form 8-K) (Sept. 10, 2014); Green Automotive Co., Current Report (Form 8-K) (May 8, 2014).

42. Worthington Energy, *supra* note 41.

43. Green Automotive Co., Corporate Filing (Form 8-K) (May 08, 2014) ("After the initial issuance GAC issued a total of 27 million additional free trading shares to Ironridge under the Stipulation formula. On or about March 28, 2014, however, Ironridge demanded GAC issue an additional 43 million free-trading shares based on Ironridge's calculations under the Stipulation."

44. Epazz, *supra* note 40 ("A total of 3,040,823,600 shares of Class A Common Stock was issued, in addition to the 75,000,000 settlement shares, in complete satisfaction of the debt. . .").

45. Worthington Energy, *supra* note 41, Ex. 10.3.

46. Jammin Java Corp., Corporate Filing (Form 10-Q) (Sept. 15, 2014) ("Additionally, as a result of each Stipulation, we agreed that at no time shall shares of common stock be issued to Ironridge and its affiliates which would result in them owning or controlling more than 9.99% of the Company's outstanding common stock.").

47. *Press Release, Green Automotive Company Closes $500,000 Investment from Ironridge Global,* MARKETWATCH (Dec. 5, 2013 12:00 PM), http://www.marketwatch.com/story/green-automotive-company-closes-500000-investment-from-ironridge-global-2013-12-05 ("The funding will help support the company's rollout" of new products.).

48. *See* ScripsAmerica, Inc. v. Ironridge Glob. LLC, 56 F. Supp. 3d 1121, 1135 (C.D. Cal. 2014).

can be filed and settled within one to two days.[49] One 3(a)(10) financier calls this "innovative financing structure" a way to "substantially reduce the transactional costs and time" and become a "long-term financial partner, assisting public companies in financing growth and expansion by supplying innovative funding solutions and flexible capital."[50]

## III. The Harms of 3(a)(10) Financing

3(a)(10) financing is damaging to the companies being financed, the shareholders who owned the stock before the transaction(s), and the marketplace as a whole. According to SEC filings, many companies engaged in 3(a)(10) financing end up issuing between eight and forty times the original number of shares agreed upon in the settlement.[51] This flood of shares in the market could in turn make traditional offerings more difficult as it may cause potential future investors to have reasonable trepidations about investing in a company whose stock price has fallen so precipitously.

The investors who already invested in the company are damaged because their investment is devalued through dilution. Investors holding stock of a company undergoing 3(a)(10) financing will likely see a drop in share price as a result of the number of shares entering the market due to the financing agreement. Unless the company files an 8-K or other document with the SEC, the investor will likely never know the 3(a)(10) settlement happened until after the transaction is completed. Issuers may intentionally withhold information from shareholders in order to keep the stock price from falling.[52] Shareholders who are notified may sell out of their position, not because the company lacks investment potential, but because of the overwhelming number of shares which will be sold and the

---

49. Court Docket Sheet, IBC Funds v. Frontier Beverage Company, Inc., No. 2014CA002832AX (Fla. Cir. Ct. June 04, 2014); Court Docket Sheet, IBC Funds LLC v. Nustate Energy Holdings. Inc., No. 2014 CA 005303, (Fla. Cir. Ct. Oct. 10, 2014) (Bloomberg Law).

50. IronRidge, http://www.ironridgeglobal.com (last visited Dec. 20, 2015); see also Ironridge Global Partners Attends Rodman & Renshaw, Euro Pacific Capital; see ThruEquity and Brean Capital Conferences in New York City, MarketWatch (Sept. 6, 2012 9:11AM), http://www.marketwatch.com/story/ironridge-global-partners-llc-attends-rodman-renshaw-euro-pacific-capital-seethruequity-and-brean-capital-conferences-in-new-york-city-2013-09-06.

51. See, e.g., Intellicell Biosciences, Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2014) (issuing 8.5 million shares originally, eventually issuing 68,766,171.); Epazz, supra note 40 ("A total of 3,040,823,600 shares of Class A Common Stock was issued, in addition to the 75,000,000 settlement shares, in complete satisfaction of the debt"); see Seanimac Int'l, Ltd., Quarterly Report (Form 10-Q) (Nov. 26, 2014) ("On March 21 2014, IBC received 310,000 shares; 290,000 shares represented a settlement fee in accordance with Section 3(a)(10) of the Securities Act and were valued at $0.06 per share, the March 13, 2014 closing price. Subsequent to March 31, 2014, an additional 6,403,900 shares were issued to IBC in full settlement of the acquired Company liabilities").

52. See SEC Sanctions 10 Companies for Disclosure Failures Surrounding Financing Deals and Stock Dilution, Sec. & Exch. Comm'n (Nov. 5, 2014) [hereinafter SEC Sanctions] http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370543368026.

pressure on the company to create artificial fixes (like a reverse split), which can "renew selling pressure."[53]

The marketplace is damaged by 3(a)(10) financing because it artificially devalues the stock. While stock offerings normally indicate success in a company,[54] they are almost always dilutive.[55] It is likely companies accepting 3(a)(10) financing will not be able to absorb the type of dilution of a normal secondary offering,[56] let alone an offering in which the financier can ask for more shares to be issued as the stock price falls.[57] Worse yet, this gives the 3(a)(10) financiers no incentive to hold the stock as a typical investor might. Despite receiving the stock at a discount,[58] holding the stock is less beneficial when selling the stock drops the share price and triggers more issuances.

Bearing in mind that a rational investor would not purchase stock certain to fall in price, and considering that a company's stock price is very likely to fall because of the dilutive nature of 3(a)(10) financing, silence to the market about the deal is key to a 3(a)(10) financier. If the market knew that the purchase of a certain company's stock would trigger the issuance of more shares, thus driving down the price, it is unlikely potential investors would make purchase. Silence about a 3(a)(10) financing agreement allows a 3(a)(10) financier to sell the stock where otherwise there would be no buyer for their discounted shares.

## IV. The Possible Violations of 3(a)(10) Financing

There are several potential issues presented by 3(a)(10) financing. These issues will be discussed in the order in which a 3(a)(10) financing agreement takes place. The 3(a)(10) financier and the target company enter into an agreement to file a pre-settled lawsuit in order to procure a fairness hearing.[59] Judges in 3(a)(10) financing settlements typically re-

---

53.  *Reverse Stock Splits*, Sec. & Exch. Comm'n (2015), http://www.sec.gov/answers/reversesplit.htm.

54.  *See generally* Richard Loth, *Why do Share Prices Fall After a Company has a Secondary Offering?*, Investopedia, http://www.investopedia.com/ask/answers/07/secondary_offering.asp (last visited Mar. 15, 2015).

55.  *See generally* Rob Renaud, *What is Dilutive Stock?*, Investopedia, http://www.investopedia.com/ask/answers/06/.asp (last visited Mar. 15, 2015).

56.  *See Secondary Offering*, Investopedia, http://www.investopedia.com/terms/s/secondaryoffering.asp (last visited Mar. 15, 2015).

57.  *See* ScripsAmerica, Inc., v. Ironridge Global LLC, 2014 BL 314688 (C.D. Cal. Nov. 03, 2014) at 2 (describing that the settlement agreement between a 3(a)(10) financier and the company stated that if the company's shares fell a certain amount, they were required to issue more shares so that it equaled the final amount of the settlement and that at any time, the 3(a)(10) financier could request the issuance of additional shares subject to a calculation based on the share price on the day before the court verified the fairness of the settlement.).

58.  *See* Epazz, *supra* note 40.

59.  ScripsAmerica, Inc. v. Ironridge Glob. LLC, 56 F. Supp. 3d 1121, 1132 (C.D. Cal. 2014) ("Because the shares were unregistered, Ironridge and Scrips had to obtain court approval under California and federal securities laws before a transfer of the stock could take

ceive a complaint, a list of the claims for which the 3(a)(10) financier bases the lawsuit, an answer, and sometimes a "Memorandum of Law."[60] The settlement agreement typically allows the 3(a)(10) financier to request more discounted shares of stock as the price goes down and contains an "adjustment mechanism" to determine the exact amount.[61] In a timeframe as short as one to two days, the judge pronounces the settlement transaction agreement "fair" to those who will be *receiving the securities* (the 3(a)(10) financier).[62] After the agreement, the 3(a)(10) financier sells the securities in the open market, thus diluting the current shareholders value.[63]

### A. Pre-Settled Lawsuits

In *Lefkowitz*, the SEC accused a financier of settling lawsuits "under the pretext" of settling past-due debts, but in actuality the shares exchanged were in "pre-settled" lawsuits.[64] In other words, the exchange of equity for debt relief (the "transaction") was already settled *before* the 3(a)(10) financier filed the lawsuit against the company. It stretches the bounds of gullibility to believe the financiers in such transactions are not filing the lawsuits for the sole purpose of meeting 3(a)(10)'s requirement that the transaction must be for a "bona fide" claim.[65] While it seems that any justiciable allegation will suffice,[66] there was at least one instance in which the SEC did not provide no-action protection in a 3(a)(10) settlement because the issued securities pertained to a future contract that had not taken place yet.[67] To the SEC, it appeared as though the company had simply signed a bad, more expensive than bargained for, contract and was attempting to use 3(a)(10) to finance the deal.[68]  The SEC later said they would not recommend action in regards to the exchange after the company corrected its facts to state that the contract had already caused the company to "default."[69]  It can be inferred that while the definition is very

---

place. Thus, on October 11, 2013, Ironridge filed a breach of contract complaint in Los Angeles Superior Court that sought to collect the accounts payable debts; it sued as the successor in interest to Scrips' creditors under receivables purchase agreements into which it had entered with the creditors.").

60.   *Memorandum of Law*, IBC Funds LLC v. Healthy & Tasty Brands Corp., No. 2014-010463-CA-01 (Fla. Cir. Ct. May 6, 2014) (Bloomberg Law).

61.   *See* ScripsAmerica, Inc. v. Ironridge Global LLC, 56 F. Supp. 3d 1121, 1132 (C.D. Cal. 2014).

62.   Hicks, *supra* note 13, § 3:1.

63.   *See generally* SEC Sanctions, *supra* note 52.

64.   *See* Complaint for Injunctive Relief, *supra* note 18, at 2.

65.   15 U.S.C. § 3(a)(10) (2012);

66.   Hɪᴄᴋs, *supra* note 13, at § 3:9 ("Presumably, any justiciable allegation will suffice as long as it relates to an actual injury and thus to an outstanding claim.").

67.   Carex Int'l Inc., SEC No-Action Letter, 1975 WL 9531 (Sept. 10, 1975).

68.   *Id.*

69.   Carex Int'l Inc., SEC No-Action Letter, 1975 WL 11284 (Oct. 30, 1975).

broad, the "bona fide" debts required by 3(a)(10), must have caused the sort of financial stress 3(a)(10) was written to relieve.[70] A court may find, in line with the legislative intent, that a claim may not be bona fide if the company would not default but for the 3(a)(10) settlement.

Negotiations between the parties before the settlement, indeed before the assignment of the claims, may cut against the fairness requirement of 3(a)(10). Both the SEC and the courts have mostly avoided a definition of "fairness."[71] In discussing the factors to include in "fairness," the court in *Blinder* took judicial notice of the "adversarial" proceeding stating that "[t]here is nothing to suggest any collusion in the preparation and submission of the agreement."[72] In quoting *Blinder,* other courts have mentioned how "hotly contested" the settlement agreement was and how "the parties could not even agree on who should participate in the settlement negotiations" when deciding whether it was fair.[73] This is in stark contrast to a 3(a)(10) financing settlement in which the parties are almost never adversarial, let alone at odds; the settlement is introduced by the financier to the target company as a banker pitches a loan.[74] The target company agrees before the debt is even assigned to the 3(a)(10) financier.[75] The financier's "complaint" and the company's "answer" are then manufactured for the fairness hearing.[76]

At least one court has stated that it is "clear that Section 3(a)(10) does not provide a mechanism for obtaining a fairness hearing."[77] The "authority must come from somewhere" and the court has inherent authority to

---

70.  Securities Act Release No. 312, *supra* note 11 (stating that the "whole justification" for § 3(a)(10) was that "the examination and approval by the body in question of the fairness of the issue in question is a substitute for the protection afforded to the investor by the information which would otherwise be made available to him through registration.").

71.  Bruce Matson, *Fairness Requirement in Section 3(a)(10) of the Securities Act of 1933*, 23 Wm. & Mary L. Rev. 549, 555 (1982) ("Focusing upon these requirements, the cases, releases, and no-action letters merely reiterated the statutory language of the exemption and have avoided a discussion of what constitutes fairness in a section 3(a)(10) exchange transaction.").

72.  Sec. & Exch. Comm'n v. Blinder Robinson & Co., 511 F. Supp. 799, 801 (D. Colo. 1981) ("To the contrary, it is apparent that these attorneys have represented the interests of their clients aggressively throughout this case; that the settlement is the product of arms-length bargaining; and that their recommendation that this court accept this agreed resolution of the disputed issues results from their exercise of professional judgment as to what is in the best interests of those for whom they appeared.").

73.  S.E.C. v. Founding Partners Capital Mgmt., 2:09-CV-229-FTM-29, 2014 WL 2993780, at *13 (M.D. Fla. July 3, 2014).

74.  Dan Lonkevich, *Ironridge Breathes Life Into Debt Exchanges*, Deal Pipeline (Apr. 25, 2014), http://ironridgeglobal.com/newsroom/Ironridge-Breathes-LIFE.pdf ("We call the other side to see if it's workable. . .We only do consensual deals. We're the Warren Buffet of microcap financing.").

75.  *Id*.

76.  *Id*.

77.  Cont'l Assurance Co. v. Macleod-Stedman, Inc., 694 F. Supp. 449, 467 (N.D. Ill. 1988).

approve a "settlement of litigation."[78] The court found that it was appropriate to rule on the fairness of the settlement because 3(a)(10) "was intended primarily to offer financially troubled corporations an alternative to the burdens of registration."[79] In 3(a)(10) financing, the company was not looking to avoid the "burdens of registration," but rather was offered an opportunity to alleviate some of its debt by paying off its creditors with its own equity shares.[80]

## B. *Settlement Agreement*

Even if the settlement agreement is provided to the court[81] it may still not provide everything the judge needs to make a decision. For instance, in *Lefkowitz*, the SEC found that the 3(a)(10) financier was intentionally leaving out the "true value" of the settlement agreement and a side agreement to remit gains from the sale of the stock back to the company.[82] At no point was the presiding judge made aware of the "market value of the settlement shares," much less that the market value of those shares "exceeded the debt being extinguished by multiples."[83] While the court is shown to be aware of the total amount of the claims (through purchase agreements submitted to the court), the court is often not made aware of the value of the shares or the calculation by which they are further distributed after the date of the settlement.[84] As one court put it, "the reviewing court 'must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction.'"[85] When reviewing the terms of a 3(a)(10) financing settlement agreement, it is not possible for a judge (or

---

78.   *Id.*

79.   *Id.*

80.   *Id.*

81.   *See e.g.*, IBC Funds, LLC v. Entertainment Arts Research, Inc., No. 2014-CA-3839-NC (12th Cir. Jul. 25, 2014).

82.   *See* Complaint for Injunctive Relief, *supra* note 18, at 24.

83.   *See id.* at 34.

84.   *See* Lefkowitz Litigation Release, *supra* note 17.

85.   Brio Capital, LP v. Sanswire Corp., 2013 BL 130496, at *2 (S. Ct. May 9, 2013) ("In determining the fairness of a settlement involving issuance of exempt shares under the Securities Act, the totality of the circumstances should be considered. According to the SEC Staff Bulletin, the court must make an affirmative finding that the exchange is fair to the shareholders (SEC Staff Bulletin § 4[B][1]), and the reviewing court "must have sufficient information before it to determine the value of both the securities, claims or interests to be surrendered and the securities to be issued in the proposed transaction." (Id., § 4[B][2] [internal quotation marks and footnote omitted]; see Matter of Board of Directors of Multicanal S.A., 340 BR 154, 168 [SD NY 2006] [describing the SEC Staff Bulletin as "[t]he most authoritative description of the requirements of § 3[a][10]."].) In making such findings, factors to be considered include the extensiveness of the litigation to date, the likelihood of success on the merits of the claims and defenses, the availability of public information about the financial condition of the defendant, the ability to precisely value the stock at issue, and the costs of ongoing litigation. (See Matter of TradePartners, Inc. Investor Litigation, 2008 WL 4911797 [WD Mich 2008]; Continental Assurance Co., 694 F Supp 449 [ND Ill 1988].).").

state agency) to determine the total number of shares or their value because 3(a)(10) financiers are able to request a nearly infinite amount of shares as the share price continues to fall.

## C. *Time Issues*

Even if it were possible for all relevant and useful information to be included in a 3(a)(10) financing settlement agreement, there would still be a question as to the ability of judges in these fairness hearings to properly understand the transaction at hand. It is important to remember that this process is meant to take the place of traditional registration, a process that can take many months.[86] In a 3(a)(10) financing hearing, the court can receive the complaint, the proposed settlement agreement, and the debt claim purchase agreements and approve the settlement agreement in as little as one to two days.[87]

Further, some courts in which 3(a)(10) financing hearings often take place hold a "five minute motion calendar," which requires that attorneys make a good faith effort to resolve the issue within five minutes.[88] It has been implied that a statutory analysis shows that this sort of use of 3(a)(10) is improper—that a fairness hearing should go beyond "procedural fairness"—because the 3(a)(10) exemption requires a judicial determination of fairness to assure investor protection.[89] It is extraordinarily unlikely that a court receiving a complaint, answer, and sixty-seven page claim purchase agreement, is able to resolve whether or not the deal is fair (in one or two days) with the same level of scrutiny as would be achieved with registration statements filed with the SEC.[90] In order to properly protect companies and shareholders, a court must look over all material documents and be able to address any issues therein. Two days to review what can be hundreds of pages of documents and a five-minute hearing simply cannot provide the same level of protection as traditional SEC registration.

---

86.   *See* Complaint for Injunctive Relief, supra note 18, at 11.

87.   Notice of Hearing, IBC Funds LLC v. Healthy & Tasty Brands Corp., No. 2014-010463-CA-01 (Fla. Cir. Ct. Apr. 30, 2014) (Bloomberg Law).

88.   *Id.* ("The undersigned attorney certifies that a good faith effort to resolve the matter was made prior to scheduling the hearing and that the issues can be resolved within the court's 5 minute motion calendar.").

89.   *In re* Bd. of Directors of Multicanal S.A., 340 B.R. 154, 171 (Bankr. S.D.N.Y. 2006).

90.   Court Docket Sheet, IBC Funds LLC. V. Nustate Energy Holdings Inc., No. 2014CA005303AX, (Fla. Cir. Ct. Oct. 09, 2014) (Bloomberg Law).

D. *Are 3(a)(10) Settlement Shares Able to be Freely Traded After a Fairness Hearing Approved the Settlement Agreement?*

In a transaction that avoids Section 5 disclosures by relying on the 3(a)(10) exemption, there must be an exchange of a bona fide security.[91] In 1934, Section 3(a)(10) was pulled from Section 4 and placed under Section 3 in what has been coined a "legislative accident" as Section 3 deals with securities exemptions and Section 4 deals with exemptions of transactions.[92] This may be seen as a distinction without a difference, but it speaks to a very serious question as to whether the securities may be freely resold after the transfer. Just two years after the 1934 Act passed, Congress remarked that "[b]y placing these exemptions under section 3 it is made clear that securities entitled to exemption on original issuance retain their exemption; if the issuer is not obliged to register in order to make the *original distribution*, dealers within a year are subject to no restriction against dealing in *the securities.*"[93] (emphasis added).

In the past the SEC has been inconsistent regarding its position on a financier's ability to resell 3(a)(10) settlement shares. The Commission has issued competing no-action letters: (1) not allowing resale by non-affiliates unless they relied on a separate exemption and did not receive "substantial" shares,[94] (2) declaring that subsequent resale could only be "effectuated pursuant to registration under the Act or suitable exemption"[95] and, (3) most recently, allowing the shares to be resold by the party receiving

---

91. Securities Act of 1933 § 3(a)(10), 15 U.S.C. §77c(a)(10) (2012) (noting that a bona fide security exchange is any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved.).

92. *See* Loss, *supra* note 9.

93. Letters of Gen. Counsel Discussing Application of Section 3(a)(9), SEC Interpretive Letter, Securities Act Release No. 646, 11 Fed. Reg. 10,956 (Feb. 3, 1936) (emphasis added); *see also* H. R. Rep. No. 1838, at 40, 73d Cong., 2d Sess.(1934) 40. *See also* 15 U.S.C. 77b(a)(12) ("The result is in line with the Commission's interpretation of the act as it stood before, but the amendment removes all doubt as to its correctness."); 15 U.S.C. §77b(a)(12)); ("The term 'dealer' means any person who engages either for all or part of his time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.").

94. Koracorp Industries, Inc., SEC No-Action Letter, 1976 WL 12581 (Aug. 22, 1976) ("With respect to any public resales of the shares received upon distribution, we will not raise any question if persons who are not affiliates of Koracorp and who do not receive a substantial portion of the shares distributed pursuant to the settlement resell their shares in reliance upon the exemption from registration provided by Section 4(1) of the Act.").

95. Weatherford Int'l Inc., SEC No-Action Letter, 1976 WL 12594 (Aug. 13 1976) ("While the exemption provided by Section 3(a)(10) of the Act may be available for shares issued in settlement of a claim where the fairness of the settlement has been approved by a Court, it is our view that the transactional exemption provided by that section does not extend to subsequent resales of the securities acquired. Such resales can only be effectuated pursuant to registration under the Act or suitable exemption." Further, even when a subsequent exemption for resale is provide by Section 4(1), the "rationale" of the act should be "interpreted to permit only routine trading transactions as distinguished from distributions. Therefore, a person reselling securities under Section 4(1) of the Act must sell the securities

the shares if they were a non-affiliate because the presumptive under-writer rule was amended.[96] Consistently, however, the SEC has advised that non-affiliates receiving shares could resell them as long as they did not receive a "significant number" of shares.[97] By any reasonable standard, 3(a)(10) financiers are receiving a significant number of shares.[98]

Most courts have found that there needs to be a separate registration or exemption in order to resell 3(a)(10) securities. In *Multicanal* the Federal Bankruptcy court analyzed, and eventually remanded to a lower court, the question of whether a section 4(2) exemption was needed to be able to sell the securities received freely after the exchange.[99] In *Continental Insurance* the court found that "since the statute is designed [for]. . .an unsettled dispute" the court can exercise its jurisdiction to provide a fairness hearing.[100] However, the court "does not believe it to be appropriate

---

in such limited quantities and in such a manner so as not to disrupt the trading markets."); Carex Int'l Inc., 1975 WL 11283, at *2 (July 7, 1975).

96.   17 C.F.R. § 230, 239 (2008); The amendments to Rule 145, among other things, eliminated the presumptive underwriter provision in Rule 145(c). The SLB states that, because securities received in a Rule 145(a) transaction that was exempt under Section 3(a)(10) would not constitute "restricted securities" within the meaning of Rule 144(a)(3), those securities may generally be resold without regard to Rule 144 if the sellers are not affiliates of the issuer and have not been affiliates within 90 days of the date of the transaction. In the event that the securities are held by affiliates of the issuer, those holders may be able to resell the securities in accordance with Rule 144. Accordingly, the shares issued in accordance with above judgment are free trading as set forth above. Comment Letter from Compliance Systems Corp to the SEC Staff (Jan. 22, 2013).

97.   A recipient of Section 3(a)(10) settlement securities that were not restricted was advised that immediate resale under Section 4(1) was permissible so long as that person (1) was not an affiliate and (2) did not receive a "substantial amount" of securities in relation to the amount of securities issued in the settlement. *See, e.g.,* General Pub. Utils. Corp., SEC No-Action Letter, 1983 WL 28493 (June 29, 1983); The SEC staff consistently refused to express any view as to what constituted a substantial amount of securities in a nonaffiliate's hands, "since the issuer and its counsel are in the best position to ascertain the facts and make the requisite determination." April Indus., Inc., SEC No-Action Letter, 1977 WL 14073 (Feb. 18, 1977); *see also* International Tel. & Tel. Corp., SEC No-Action Letter, 1977 WL 10567 (June 17, 1977); Delhi Int'l Oil Corp., SEC No-Action Letter, 1977 WL 10620 (Feb. 25, 1977); WILLIAM J. HICKS, 7 EXEMPTED TRANSACTIONS UNDER THE SECURITIES ACT OF 1933 § 3:84 n. 3 (Clark Boardman Co., 7th ed. 1979).

98.   *See* IronRidge Global LTD v Green Automotive Co., Docket No. BC526570 (Cal. Super. Ct. Nov. 01, 2013) (requesting for the shares, the 3(a)(10) financier wrote the defendant, "[b]ased on the stock drop [after our initial issuance], you now owe over 6 billion (with a Carl Sagan 'b') shares.").

99.   *In re* Bd. of Directors of Multicanal, S.A., 340 B.R. 154, 159 (Bankr. S.D.N.Y. 2006) ("On remand, Multicanal argues that an exemption under § 3(a)(10) is available and that the record is sufficient to include the fairness finding required by that provision. Multicanal also contends that since the securities to be issued to the U.S. retail holders will be covered by the Registration Statement and the securities issued to the 'yes' voting noteholders will be covered by Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2), there will be no discrimination, and all of the issued securities will be fungible and freely tradable.").

100.   Cont'l Assurance Co. v. Macleod-Stedman, Inc., 694 F. Supp. 449, 467 (N.D. Ill. 1988).

to hold that the new securities are not subject to registration."[101] By its reading, the court found that the only requirement of a fairness hearing is that the court approve the "terms and conditions of the exchange," but "an express determination as to the necessity for the registration is more appropriately left to the SEC or any future disputes that may result from the exchange of securities."[102] Most recently, five different defendants in connection to the 3(a)(10) financing scheme in *Lefkowitz*, were all found to be in violation of Section 5 of the Securities Act of 1933, which requires public distributions of securities to be conducted pursuant to an effective registration statement filed with the Commission or pursuant to a valid and properly invoked exemption from registration.[103]

Most academics are in favor of requiring additional registration or exemptions for resale. The 3(a)(10) exemption is "not based on the nature of the security" and operates "more like a transaction exemption."[104] More than that, "the weight of authority leaves no doubt that 3(a)(10) is and should be a transactional exemption only."[105] The main reason is that the fairness hearing may protect the initial investors who receive the shares, but it does not provide assurance to the secondary purchasers like the protection afforded by a prospectus.[106]

The SEC itself has argued that 3(a)(10) financing companies are actually unregistered dealers and are therefore in violation of Section 15(a)(1) of the Exchange Act.[107] A "dealer" is someone who is "engaged in the business of buying and selling securities. . .for a person's own account through a broker or otherwise."[108] While the issue has not been fully ad-

---

101.  *Id.*

102.  *Id.*

103.  *See* Lefkowitz 23206, *supra* note 37.

104.  Thomas Lee Hazen, EXEMPTIONS FROM THE SECURITIES ACT REGISTRATION REQUIREMENTS – GENERAL CONSIDERATIONS 51-52 (2007), http://files.ali-aba.org/files/course books/pdf/CM052_chapter_06.pdf ("Sections 3(a)(9), 3(a)(10), 3(a)(11), 3(b), 3(c) all operate more like transaction exemptions—i.e. the exemption is not based on the nature of the security being issued and thus does not apply to every transaction in those securities. For example, downstream resales may need a new exemption or else face registration. . . Section 4 identifies transactions which are exempt from registration. Thus, the crucial issue is the structure of the transaction in which the securities are issued . . . In 1996, Congress added section 28 of the Securities Act which gives the SEC broad exemptive power not tied to specific types of securities or transactions . . . Under this provision, the Commission may adopt rules or regulations conditionally or unconditionally exempting any person (or class of persons), any security (or class of securities) or any transaction (or class of transactions) "to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors. . . Scope of the exemptions—sections 3, 4, and 28 of the Securities Act are exemptions from registration. They are not exemptions from the antifraud provisions.").

105.  Ash, *Reorganizations and Other Exchanges Under Section 3(a)(10) of the Securities Act of 1933*, 75 NW. U.L. REV. 1, 26 (1980).

106.  *See id.* at 26–27.

107.  *See* IronRidge Global Partners, Administrative Proceedings Rulings Release No. 3298 (ALJ Nov. 5, 2015), https://www.sec.gov/alj//2015/ap-3298.pdf.

108.  15 U.S.C. § 78c(a)(5)(A) (2012).

judicated, an Administrative Law Judge ("ALJ") did find that there were material facts that are in dispute to overcome a motion for summary disposition.[109] The case turned on whether the 3(a)(10) financier's buying and selling of securities was done as part of regular business.[110] The ALJ found that the definition of dealer "cast a wide net," and that a 3(a)(10) financier could fall under that definition based on the "totality" of a "fact-specific endeavor."[111]

## V. The Devil's advocate? How much blame should appropriately be placed on the target company?

The companies accepting 3(a)(10) financing are taking a big risk. In order to keep current investors apprised of significant corporate events, public companies are required to file a Form 8-K within four business days of a "triggering event."[112] A 3(a)(10) financing scenario can be a triggering event, and there are two items under Form 8-K that must be reported to investors in such a situation: item 1.01 and item 3.02.[113] Under item 1.01, a registrant must disclose within four business days its entry into a material definitive agreement.[114] Under item 3.02, a smaller reporting company[115] must disclose a sale of unregistered securities, within four business days of the sale, unless the securities constitute less than five percent of the shares outstanding in that particular class of securities.[116]

According to the SEC, this does not mean five percent at the date of the settlement, but every time the company issues five percent or more in any tranche.[117] In 2014, the SEC filed cease and desist orders against ten companies for a combined twenty two unregistered stock sales of over five percent of total issued and outstanding stock and other violations under Exchange Act rules 13(a) and 12(b).[118] The timeline in the cease and desist orders show that the 3(a)(10) financing companies forced the compa-

---

109.   IronRidge Global Partners, *supra* note 107.

110.   *Id.* at 8.

111.   *Id*.

112.   *Form 8-K*, Sec. & Exch. Comm'n. http://www.sec.gov/about/forms/form8-k.pdf (last visited Mar. 15, 2015).

113.   *Id.*

114.   *Id*.

115.   *Changeover to the SEC's New Smaller Reporting Company System,* Sec. & Exch. Comm'n (Jan. 25, 2008), http://www.sec.gov/info/smallbus/secg/smrepcosysguid.pdf (qualifying as "smaller reporting companies, ". . .if they (1) have a common equity public float of less than $75 million or (2) are unable to calculate their public float and have annual revenue of $50 million or less, upon entering the system").

116.   *Id.*

117.   SEC Sanctions, *supra* note 52.

118.   *See id.* ("According to the orders, the companies entered in a financing agreement pursuant to which [the company] issued shares of stock to the financing company purportedly in reliance on a registration exemption found in section 3(a)(10) of the Securities Act of 1933. The financing agreement provided for obligations that were material and enforceable against [the company].").

nies to sell between 5% and over 35,000% of their outstanding stock over a period ranging from as little as one week up to several months.[119]

In *Lefkowitz*, the SEC found it compelling that the agreement between the 3(a)(10) financier and the target company was pre-settled. Any time there are two apparent adversaries entering into an agreement, there is an opportunity for fraud. Indeed, beyond not properly keeping investors informed about the 3(a)10) transactions, they were also giving kickbacks to the target company after completing the deal.[120] Criminal charges were filed against the target company for making "false and fictitious statements" in the company's filings with the SEC regarding the 3(a)(10) transactions.[121]

## VI. Solutions to Allow 3(a)(10) Financing

While it has been suggested further safeguards are not necessary in 3(a)(10) transactions because fairness hearings are a good substitute for the registration process,[122] the evidence presented in previous sections indicates a need for additional safeguards to protect the system from 3(a)(10) financing. 3(a)(10) financing clearly does not benefit the target company, the investors holding securities in the target company before the 3(a)(10) transaction, or the market as a whole. For these reasons, the SEC needs to step in to protect investors.

The SEC needs to bring enforcement actions against 3(a)(10) financing companies.[123] 3(a)(10) financiers bring pre-settled lawsuits against companies in order to have a fairness hearing where normally the lawsuits re-

119.   *See id.* (noting that in one cease and desist order, a company had been forced to sell over seven billon unregistered shares of common stock. The company failed to report the extreme nature of the dilution to shareholders for a little over a month. During this time (according to http://www.otcmarkets.com/stock/COWI/) the company's share price fell from a high of $.001 to $.0001, a 1000% percent fall, from which it had not recovered as of Nov. 6, 2015).

120.   Complaint for Injunctive Relief, *supra* note 18, at 17.

121.   *See* U.S. v. Unico, Inc., Deferred Prosecution Agreement, No. 3:13-CR-00355-BTM (S.D. Cal., Jan. 30, 2013), http://www.gibsondunn.com/publications/Documents/Unico_Inc_DPA.pdf.

122.   Comm. *on Fed. Regulation of Sec., Integration of Securities Offerings: Report of the Task Force on Integration by the Committee on Federal Regulation of Securities*, 41 Bus. Law. 595, 636 (1985 - 1986). ("During the past fifty years, many changes in the securities laws have augmented investor protection in a number of ways. As a result, the registration process has become less important in the overall pattern of investor protection, diminishing the necessity of an interpretive policy favoring registration. In view of these developments, we believe that as a matter of policy there should also be integration safe harbors for offerings made in reliance on section 3(a)(9) or section 3(a)(10) of the Act, since, in such offerings, there is little need for the registration safeguards.").

123.   Ironridge Global Partners, Securities Exchange Act of 1934 Release No. 75272 (June 23, 2015). ("This year, the SEC brought its first enforcement action against the 3(a)(10) financier ordering it to cease and desist for willful violations of Sections 15(a) and 20(b) of the Securities Exchange Act of 1934. It claimed, as I have here, that 3(a)(10) financiers are actually unregistered dealers.").

lated to these claims would be brought as part of the dispute between the parties. These suits are brought simply to use the court to transfer shares without the normal scrutiny of the registration process.[124] A company is perfectly able to purchase unpaid debt contracts and enforce agreements in other ways, but 3(a)(10) financiers are purchasing the debt only after first working out a deal for reduced-price shares. If the two companies had the ability to trade outstanding debt for shares without the courts, they probably would. 3(a)(10), however, is not intended to help companies raise capital using a fairness hearing; 3(a)(10) is intended to give those with a prior dispute an opportunity to settle by exchanging shares for bona fide claims.[125] Current 3(a)(10) transactions are in direct opposition to the legislative intent of 3(a)(10) and should be seen as outside of the 2008 SEC guidance on the appropriate use of Section 3(a)(10).[126]

The judges conducting fairness hearings only review the settlement documents for a short period of time (as little as one to two days) before the hearing, and in some cases require the hearing to be held in five minutes or less.[127] This brings into question whether the judges conduct a "fairness" hearing at all given the courts' interpretation of what the enumerated fairness elements should be.[128] Even if they did have time, the judges are left without material information, such as the market value of the shares the 3(a)(10) financier will receive.

Although unlikely, if the 3(a)(10) financier could provide the market value of the initial shares proposed in exchange for the outstanding claims, this would not satisfy 3(a)(10)'s requirement that the exchange be for "bona fide" outstanding securities because the financier most likely included a clause in the pre-settled agreement that allows them to take the shares at a discounted price, sell them freely, and collect more shares as the share price of the target company falls. But even if the securities and the hypothetical future securities were deemed "bona fide" within the language of Section 3(a)(10), a judge could find that while the fairness of the initial disbursement of shares was sound, the additional issuances of shares

---

124.    Cont'l Assurance Co. v. Macleod-Stedman, Inc., 694 F. Supp. 449, 467 (N.D. Ill. 1988) ("It is clear that § 3(a)(10) does not provide a mechanism for obtaining a fairness hearing. It is not a jurisdictional or procedural statute. Authority for the hearing must come from elsewhere. This court has the inherent authority to approve a settlement of litigation. Also, under the Declaratory Judgment Act, this court has the authority to rule on the issue before it in this case or controversy. There is no jurisdictional problem, it is only a prudential problem of whether this is an appropriate case in which to act. Section 3(a)(10) was intended primarily to offer financially troubled corporations an alternative to the burdens of registration. Hicks § 3.02; Ash, *Reorganizations and Other Exchanges Under Section 3(a)(10) of the Securities Act of 1933*, 75 Nw. U. L. Rev. 1, 9 (1980).").

125.    Complaint for Injunctive Relief, *supra* note 18, at 10.

126.    *See* SEC Staff Legal Bulletin No. 3A, *supra* note 16.

127.    *See* Court Docket Sheet, IBC Funds LLC. v. Nustate Energy Holdings Inc., No. 2014CA005303AX (Fla. Cir. Ct. Oct. 09, 2014) (Bloomberg Law); *see also* Notice of Hearing, *supra* note 87.

128.    *See In re* Bd. of Directors of Multicanal S.A., 340 B.R. 154, 169-72 (Bankr. S.D.N.Y. 2006).

exchanged for debt, are not being exchanged after a fairness hearing and are therefore not freely tradable as the shares are unregistered and have not met the requirements of the exemptions of the Securities Act.

At a minimum, the SEC needs to make its guidelines more clear as to the requirements and expectations of all parties involved in 3(a)(10) financing. First, the SEC needs to officially adopt the fairness standards set forth in the case law. The court should be required to analyze: (i) the recommendations of counsel; (ii) the scope of the record as an indication of the adequacy of the investigation into the facts; (iii) the apparent alternatives to settlement; (iv) the nature and volume of responses from those receiving notice of the hearing; (v) the opportunity for direct participation in the process of obtaining full disclosure;[129] (vi) the liquidation value of the business before and after the proposed settlement; (vii) whether the settlement was of fair value; and (viii) whether the settlement was reached after fair dealing.[130] These factors will require the courts to look deeply into 3(a)(10) transactions and ferret out potential issues.

Next, the guidelines should speak specifically to whether shares may be taken by the financier after the date of the settlement and how many shares is "significant" enough to trigger the SEC's own previous guidance. Based on the 2004 Form 8-K disclosure changes requiring a company to publicly disclose when they sell unregistered shares above five percent of their outstanding shares,[131] a heightened disclosure requirement for 3(a)(10) financing companies should be implemented. If a 3(a)(10) financier were to receive more than five percent of the total outstanding shares of a company in exchange for recently purchased claims, the SEC should require that the market be made aware of the transaction, its details, the parties involved, and the potential impact to the share value before the unregistered shares are deemed exempt under Section 3(a)(10). In order to further the SEC's mission of open markets and informed investors, the financier and the issuer should be jointly responsible for informing the market.[132]

Finally, there should be congressional support to amend Section 3(a)(10). First, the exemption should be placed back in Section 4 as a transactional, rather than a security based exemption. The "legislative accident"[133] of moving 3(a)(10) out of Section 4 caused confusion about

---

129.  Sec. & Exch. Comm'n v. Blinder Robinson & Co., Inc., 511 F. Supp. 799, 801 (D. Colo. 1981).

130.  *In re* Bd. of Directors of Multicanal S.A., 340 B.R. 154, 170 (Bankr. S.D.N.Y. 2006).

131.  17 C.F.R. §§ 228–230, 239–240, 249 (2004).

132.  *See* Regulation 13D-G, Securities and Exchange Commission, http://www.ecfr.gov/cgi-bin/text-idx?node=pt17.4.240&rgn=div5#sg17.4.240_113b2_62.sg29 details about the transaction if they have not already).

133.  *See* Loss, *supra* note 9.

whether it was a securities or transaction based exemption.[134] Second, 3(a)(10) should be barred from use in situations where investors do not know the total number of potential shares that could be diluting their investment. This would mean, at minimum, reporting the maximum number of shares that could be exchanged in a given 3(a)(10) transaction as well as the equation used to derive that total. Also, any amendment to Section 3(a)(10) should bar provisions in a settlement agreement that would allow companies to issue additional shares to the financier without current shareholders' knowledge. This can be done one of two ways. First, require the issuing company in a 3(a)(10) transaction to notify all current shareholders of the judgment. This will serve a similar purpose as a registration statement and will notify shareholders of the potential dilution that could occur while they wait for a Form 8-K filing with the SEC. Second, the language of Section 3(a)(10) could simply state that the judge or agency needs to find the settlement terms and conditions fair to all parties involved, rather than just the party receiving the securities.

## VII. Conclusion

Section 3(a)(10) of the Securities Act is meant to allow companies in dire straits a way to make good on their outstanding claims by issuing shares in exchange for bona fide outstanding claims. The investors, 3(a)(10) financiers in this context, are protected by means of a judge or agency reviewing the terms and conditions of the exchange to make sure they are fair to the investors receiving the shares of a struggling company. 3(a)(10) financing, which is a practice where the investor actively looks for companies who would like to trade its debt for discounted shares, results in the possibility of a financier receiving an almost infinite number of shares if the stock price falls. This practice not only falls outside of the legislative intent of Section 3(a)(10), but also leads to violations of Sections 5, 12, and 13 of the Securities Act of 1933. Rule makers must focus on this growing practice to blatantly skirt the traditional registration process of the Securities Act and amend Section 3(a)(10) to better protect current shareholders of the target comp any, the target company itself, and the marketplace from the harmful effects of 3(a)(10) financing.

---

134.  *See id.* at 709 (noting that a proposal to amend the Securities Act by moving 3(a)(10) and others back into Section 4 was attempted in 1941 and again in 1959, but the proposals were eventually dropped for substitute bills).



EXHIBIT
4

CS2-640

MAGNA   250



NUMBER

640

PAR VALUE: $0.001

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT.
INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA.

Yippy, INC.

SHARES

***200,000***

CUSIP#98584Y202

THIS CERTIFIES THAT

MAGNA GROUP LLC

IS THE RECORD HOLDER OF       *** Two Hundred Thousand ***

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OF 1933 AS AMENDED, OR APPLICABLE STATE
SECURITIES LAWS. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND
NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD,
TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION
STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS
AMENDED, OR APPLICABLE STATE SECURITIES LAWS, UNLESS THE COMPANY HAS
RECEIVED AN OPINION OF COUNSEL WHICH IS SATISFACTORY TO THE COMPANY, TO
THE EFFECT THAT SUCH REGISTRATIONS ARE NOT REQUIRED.

Fully paid and non-assessable shares of **Yippy, Inc.** Common Stock

transferable on the books of the Corporation in person or by attorney upon surrender of this certificate duly endorsed or assigned. This certificate
and the shares represented hereby are subject to the laws of the State of Nevada, and to the Articles of Incorporation and Bylaws of the
Corporation, as now or hereafter amended. This certificate is not valid until countersigned by the Transfer Agent.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:       September 27, 2012

Yippy, Inc.
CORPORATE
Seal
NEVADA

CHIEF EXECUTIVE OFFICER

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT

Countersigned by

PACIFIC STOCK TRANSFER COMPANY
Las Vegas, Nevada

Authorized Signature

CONFIDENTIAL

YIPPY 001880

**EXHIBIT 5**

CS2-640

MAGNA    250

NUMBER

640

PAR VALUE: $0.001

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT.
INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA.

# Yippy, INC.

SHARES

***200,000***

CUSIP#98584Y202

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL WHICH IS SATISFACTORY TO THE COMPANY, TO THE EFFECT THAT SUCH REGISTRATIONS ARE NOT REQUIRED.

THIS CERTIFIES THAT

MAGNA GROUP LLC

IS THE RECORD HOLDER OF     *** Two Hundred Thousand ***

Fully paid and non-assessable shares of **Yippy, Inc.** Common Stock transferable on the books of the Corporation in person or by attorney upon surrender of this certificate duly endorsed or assigned. This certificate and the shares represented hereby are subject to the laws of the State of Nevada, and to the Articles of Incorporation and Bylaws of the Corporation, as now or hereafter amended. This certificate is not valid until countersigned by the Transfer Agent.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:     September 27, 2012

Yippy, Inc
CORPORATE
Seal
NEVADA

CHIEF EXECUTIVE OFFICER

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT

Countersigned by

PACIFIC STOCK TRANSFER COMPANY
Las Vegas, Nevada

Authorized Signature